ST. MARK COPTIC ORTHODOX CHURCH, Plaintiffs and Counterdefendants-Appellees, v. ISHAC TANIOS *et al.*, Defendants and Counterplaintiffs-Appellants (Onsy Menias, Counterdefendants-Appellees; Harris Bank Hinsdale, Defendant).

Second District No. 2—90—0547

Opinion filed May 3, 1991.

Marty J. Schwartz and Nicholas Geroulis, both of Wolin & Rosen, Ltd., of Chicago (Michael E. Pildes, of counsel), for appellants.

Mark J. McAndrew, of Griffin & Fadden, Ltd., of Chicago (Joseph E. Fitzgerald, of counsel), for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

This is an appeal from the judgment of the circuit court of Du Page County entered on cross-claims to determine which of two factions has the right to control the administrative and financial affairs of the corporate plaintiff, the St. Mark Coptic Orthodox Church of Chicago. This church, which is located in Burr Ridge, Illinois, is the Chicago parish of the Coptic Orthodox Church of Egypt (the Church). St. Mark's will be referred to herein as the Chicago parish.

We will refer to the first of the two factions seeking control as the Church faction. That faction is comprised of the individual plaintiff and counterdefendant, Father Basilios Sedrak, and the six other counterdefendants, Dr. Onsy Menias, Dr. Wagih Nessim, Fayek Aboutar, Dr. Atef Moawad, Dr. Ibrahim Ibrahim and Dr. Adley Khalil. The second of the two factions will be referred to as the Tanios faction. It is comprised of defendants Ishac Tanios, Dr. Yousef Atallah, Dr. Saad Saad, Dr. Aziz Soliman and Dr. Adel Michael.

The trial court's judgment was that the Church faction has the right to control the administrative and financial affairs of the Chicago parish. The Tanios faction appeals, contending the court erred (1) in refusing to rule that the August 1988 bylaws governed the Chicago parish and (2) in finding that the actions of the Church faction were authorized under the Religious Corporation Act (Ill. Rev. Stat. 1989, ch. 32, par. 164 et seq.).

The Church, said to have been founded by St. Mark in 54 A.D., is 8¾-million members strong, eight million of whom live in Egypt. It is divided into geographical regions called dioceses which are further subdivided into parishes. The Church is hierarchical, that is, authority is vested in a series of ascending ecclesiastical judicatories. The highest priestly, legislative and judicial authority in the Church is the Holy Synod. The Holy Synod is governed by a written constitution and bylaws approved by it in 1985. The president of the Holy Synod is the pope, the Patriarch of Alexandria (currently Pope Shenouda III), and its members are the bishops. Each bishop serves a diocese and each parish within a diocese is served by a priest. Clerical deacons assist the priests. The Church in North America has grown to 52 parishes since the mid-1960's, and it comprises a single diocese. The pope presently acts as the bishop for the North American diocese. Each American parish has a governing body called the Board of Deacons. The parish priest is president of the board; he presides over board meetings, is authorized to establish bank accounts and oversees parish life in general. The composition of the board and the manner in which it operates are specified in a constitution and bylaws.

The Chicago parish first was established in 1969 in Roselle, Illinois. The Church missionary responsible for the North American parish development, Father Marcos Marcos, appointed a board of deacons for the Chicago parish and provided it with the same constitution and set of bylaws (the 1969 bylaws) which he gave to all the new parishes in the United States and Canada. Those bylaws, formulated by him and approved by the pope with some changes, were the bylaws the pope stated would govern the churches in North America. Testimony at trial conflicted as to whether these bylaws were adopted by the board of deacons of the Chicago parish.

The Chicago parish's first permanent priest, Father Marcos Bishay, was assigned in 1972. In 1978, in order to accommodate the larger parishes in North America, minor changes—such as the number of board members or the length of their term—were made to the 1969 bylaws. The pope introduced this modified version (the 1978 bylaws) for those parishes which would like to, or need to, adopt it.

After Father Bishay died in 1979, Father Anba Bishoy was assigned to the Chicago parish. Father Bishoy served from 1980 until he was assigned to another parish in August 1988. Near the beginning of Father Bishoy's tenure, the Chicago parish acquired land in Burr Ridge, Illinois, and constructed a church there in 1981. In connection with the financing of the construction at the then First National Bank of Hinsdale (now Harris Bank Hinsdale), an "Affidavit of Religious

Corporation" signed by Ishac Tanios as secretary was filed with the Du Page County recorder of deeds on August 13, 1982.

In 1987, a question arose as to whether the 1969 or 1978 bylaws would be followed in an upcoming election of board members. Under the 1969 bylaws, all members were to be elected; under the 1978 bylaws, half were to be elected and half appointed by the priest. After reviewing both sets of bylaws it was decided all members would be elected; neither the 1969 nor the modified 1978 bylaws were specifically adopted by the board at that time.

In July 1988 a group of three visiting bishops were accosted in the Burr Ridge church by three parishioners who were loyal to Father Bishoy and were engaged in an altercation. The three parishioners subsequently were excommunicated by the pope, and, at the direction of the pope, Father Bishoy was removed on August 17 to another parish. A new priest was to be appointed in September. Father Bishoy's removal angered some members of the parish and apparently was the catalyst for subsequent events which led to the instant cause.

Between August 17 and September 1, 1988, the board caused to be drafted a new constitution and bylaws (the 1988 bylaws). These new bylaws were to be for a subsequently formed not-for-profit corporation. Under these bylaws, the congregation would "select" the parish priest, who would then be ordained or delegated by the pope, and "guide and oversee the spiritual program of the parish." This language contrasts with the prior and subsequent versions of the bylaws which provide that the priest is "ordained or delegated" by the ecclesiastical authorities (1969 bylaws) or pope (1978 and September 1989 bylaws) or "appointed" by the pope (November 1989 bylaws). The Church faction's initial complaint appended the September 1989 bylaws as "[a] true and correct copy of the Constitution and By-Laws of the Church"; its subsequent motion to dismiss the Tanios faction's counterclaim appended the November 1989 version of the bylaws as the "true and correct copy," however. The November 1989 bylaws include a provision that if the priest is unaccepted by the majority of the spiritual members of his parish, the bishop, along with the clerical council of the diocese, makes "the suitable decision concerning his situation." The clerical council, which acts as the church court, is headed by the bishop of the diocese with priests appointed by the bishop as members of the council of each diocese.

The priest's role specified in the 1988 bylaws ("guide and oversee the spiritual program of the parish") also contrasts with that described in 1969, 1978 and 1989, to wit, [he] "shall guide and oversee the total parish program, and is ultimately responsible for the whole

life and activities of his parish." The 1978 bylaws also included the phrase "[h]e is the only one to represent his Church before all local authorities."

Further, rather than being an "indivisible and inseparable part of the Coptic Orthodox Church of Egypt" as stated in the 1969, 1978 and, later, the 1989 uniform bylaws, the preamble of the newly drafted 1988 bylaws stated the corporation would "follow the spiritual doctrine and rites of the Coptic Orthodox Church of Egypt." The 1988 bylaws also deleted the vow of office which, under the 1969, 1978 and 1989 uniform bylaws, the members of the board of deacons were to take. *Inter alia*, the members vowed to uphold the doctrines, teachings, holy canons and principles of the Coptic Orthodox Church, as well as the constitutional charter, discipline and regulations of the Coptic Orthodox diocese of North America.

The 1988 bylaws did not include a bylaws amendment provision unlike the bylaws of 1969 (submit proposed amendment to the General Board of the church whose approval in that regard shall be final), 1978 (amendment should be authorized by the pope), September 1989 (amendments should be authorized in writing by the pope) and November 1989 (Synodical Committee for Coptic Orthodox Churches in Immigration headed by the pope can amend at any time and will decide whether to accept amendments proposed by local churches of the General Board of the diocese). Instead, the 1988 bylaws provided that "these by-laws *** shall be registered with the Corporation Department of the State of Illinois."

Under the 1969 bylaws, the members of the board of deacons are elected and vacancies are filled by the successive candidate in the previous election. Under the 1978 bylaws, half of the members are elected by the voting members of the church and the other half are appointed by the president (the parish priest). Vacancies are filled by the candidate with the next highest vote in the previous election. Under the 1988 bylaws, the members are elected. Up to two vacancies are filled by appointment by the board, and the board may remove any board member "if the need arises" by an affirmative vote of two-thirds of the members. Under the September 1989 bylaws, four members are elected and subsequently ratified by the pope; three are appointed by the president with prior ratification from the pope. A vacancy in an elected member's position is filled by the next-highest vote-getter in the previous election; an appointed vacancy is filled by appointment by the president. Under the November 1989 bylaws, the members of the board are selected by the bishop from among those who obtain the consent of the majority of the spiritual members of

the church after acclamations and objections thereto are presented by the congregation. These 1989 bylaws also provided that "trustees, if any, are to be appointed by the bishop from among the members of the board." The bishop has the right to remove and reselect an individual board member or the entire board for deviation from the faith or breach of fiduciary duty.

A certificate of incorporation of the Chicago parish as a not-for-profit corporation was issued by the Illinois Secretary of State on September 28, 1988. The religious corporation formed in 1982 in connection with the building of the church was neither dissolved nor merged into this not-for-profit corporation. The not-for-profit corporation never elected or established a board of directors after the certificate of incorporation was issued, nor did it formally adopt the 1988 bylaws which were approved by the board of deacons in August 1988. The only evidence of registration of the 1988 bylaws was in December 1988 when the Chicago parish forwarded copies of its articles of incorporation, the bylaws and its Internal Revenue Service exemption documentation to the Illinois Attorney General's office in compliance with the registration provisions of the Charitable Trust Act (Ill. Rev. Stat. 1989, ch. 14, par. 51 *et seq.*) and "An Act to regulate Solicitation and Collection of Funds \*\*\*" (now known as the Solicitation for Charity Act) (Ill. Rev. Stat. 1989, ch. 23, par. 5101).

The new priest who arrived at the Chicago parish in September 1988 left two months later after an incident with one of the previously excommunicated parishioners. Consequently, as of December 1988, the Chicago parish was without a priest. At a meeting of the entire congregation in January 1989, it was decided that a letter should be drafted and sent to the pope which acknowledged the congregation's obedience to the pope's authority. It was also decided in January that a contingent from the board of deacons would meet with the pope in Cairo. The purpose of the meeting with the pope was to find out how to obtain forgiveness for the three excommunicated parishioners, "to see what [the pope] has against us as far as either bylaws or the ownership of the church," and to request a permanent priest for the Chicago parish.

At a meeting of the board of deacons on February 7, 1989, attended by the pope's representative, Bishop Butros, there was a continuation of previous discussions which board treasurer Dr. Adel Michael had in Los Angeles and New York with Bishop Butros regarding what the pope's concerns were about the 1988 bylaws and whether the set of bylaws was acceptable or not. When Bishop Butros asked whether the board had bylaws which the Chicago parish fol-

lows, he was told that they "had the August 1978 by-laws" which were sent to them to be reviewed and changed as necessary in accordance with local laws. The bishop was told that the changes which appeared in the 1988 bylaws were reviewed by three attorneys with expertise in religious law and that the changes were necessary for the protection of the church and the congregation.

A copy of the 1988 bylaws was signed by all members of the board except Aboutar, who was absent, and given to the bishop to take to the pope. The board decided to add two resolutions to the bylaws: (1) "[t]he Church will not be sold without the Permission of His Holiness Pope Shenouda III, the Pope of Alexandria or his representative"; and (2) "[i]n the case of dissolution of the Church His Holiness Pope Shenouda III or his representative of the American Archdiocese will decide to what Churches of Coptic Charities the proceeds will go in North America." A letter setting out these resolutions was sent to the pope following the February 7 meeting.

In March, Nessim, Moawad, and Tanios met with the pope in Cairo. The pope requested inclusion of the "inseparable and indivisible part of the Mother Church" language in the 1988 bylaws but the board members could not agree to this without talking with the lawyers about the change. Bishop Serapian testified at trial that the "inseparable and indivisible" language is a basic expression of the oneness and unity of the church and that the 1988 bylaws were in conflict and not in harmony with the uniform bylaws due to the exclusion of this language.

Following their meeting, the pope set out an agenda for reconciliation with the three excommunicated members and indicated to the three that he would appoint a priest to officiate the mass on Saturdays at the Chicago parish. He also advised the three that a new uniform set of bylaws was being prepared for distribution the following summer.

By the time the three board members returned to Chicago, Father Sedrak had been delegated by the pope to serve the parish's religious needs. While maintaining his position as permanent priest for St. Mary's in St. Louis, Father Sedrak traveled to the Chicago parish for one day each week to officiate at the mass. Thereafter, a conflict arose between two members of the board of deacons of the Chicago parish, Nessim and Saad, and by June 1989, only the five members of the board comprising the Tanios faction would attend board meetings.

On June 1, the Tanios faction, acting as a quorum of the board, voted to suspend Nessim for one year. It also passed a resolution authorizing the collection of money for marriages, baptisms and funerals

from nonvoting members of the Chicago parish, that is, members who had not contributed a minimum of $500 per year to cover the church's operating expenses. A letter to church members in June advising them of the fees for sacraments was prefaced in part with the language "[i]n accordance with our by-laws, and as presented and approved by His Holiness Pope Shenouda III in several by-laws." The collection of money for the performance of sacraments was disapproved by Father Sedrak from the pulpit during church service. Bishop Serapian testified at trial that requiring the payment of money for receiving one of the seven sacraments—as opposed to receiving a donation—would absolutely not be permissible under any set of circumstances.

During the summer of 1989, the authority of Father Sedrak to preside over the church affairs came into contention on the ground he was a temporary rather than a permanent priest and he had not been acclaimed by the Chicago parish. By letter dated September 1, 1989, the pope delegated Father Sedrak to pastor the Chicago parish and preside over the board of deacons. By another letter dated September 12, the pope authorized Father Sedrak to appoint two additional members to the board of deacons. Counterdefendants Dr. Ibrahim Ibrahim and Dr. Adley Khalil were subsequently appointed as these two additional members.

Following a service on September 9, Father Sedrak was explaining to the congregation the new uniform set of bylaws for all churches in North America and Canada (the September 1989 uniform bylaws) which were sent from the pope. He was interrupted during his speech with a statement that the Chicago parish already has bylaws. A noisy disturbance ensued, and Father Sedrak concluded his remarks.

Following this disturbance, the six members of the Church faction along with Father Sedrak met on September 22 and voted to remove defendants Tanios and Michael from their positions as secretary and treasurer of the board of deacons and elected in their places Menias and Khalil. That same date, Menias, as secretary, requested Michael by letter to deliver all documents regarding the treasury to Khalil and informed him that no more charges would be honored at the bank and that the account number at the bank had been changed.

The next day, September 23, Father Sedrak was unable to enter the church because Tanios had caused the locks to be changed. With police assistance, Father Sedrak gained entrance to the building. Harris Bank Hinsdale froze the Chicago parish bank account and

would not honor any direction with regard to the land trust pending court order regarding who shall have access to the accounts.

As a result of the foregoing activity, Father Sedrak filed a complaint on September 27, 1989, seeking to restrain temporarily and permanently the Tanios faction from disrupting an impending papal visit scheduled for October by engaging in any conduct to deny access to the church to any of its members or its ministry and to turn over to him all the keys to the church building and all the books and records of the church. Sedrak's complaint also sought to have the Tanios faction refrain from representing themselves as representatives of the church and to account for all sums in the church treasury over which they exercised control. As noted above, the September 1989 version of the pope's uniform bylaws was appended to the complaint as being "a true and correct copy of the Constitution and By-Laws of the Church." It was alleged in the complaint that in July 1988 (prior to the adoption of the August 1988 bylaws), the then existent 1978 bylaws stated that any amendment thereto "should be authorized" by the pope.

In response to the filing of the complaint by Sedrak, the Tanios faction filed a petition for temporary restraining order and permanent injunction and, subsequently, an amended counterclaim for declaratory judgment. The counterclaim sought, *inter alia,* a declaration that the August 1988 bylaws govern the Chicago parish; that the Tanios faction constitutes the majority of the board of deacons and, as such, has control over the church's bank accounts; and that the action of the Church faction on September 22 (appointing Menias and Khalil as secretary and treasurer, respectively, and removing Tanios and Michael from those positions) was a nullity.

On December 7, 1989, the Church faction moved to dismiss the amended counterclaim for declaratory judgment under section 2—619 of the Civil Practice Law (Ill. Rev. Stat. 1989, ch. 110, par. 2—619). As noted above, appended thereto was a copy of the uniform bylaws promulgated by the pope and the Holy Synod's Committee on Immigration on November 28, 1989 (the November 1989 bylaws). On December 18, the court granted the motion to dismiss the amended counterclaim on the ground it lacked subject-matter jurisdiction to adjudicate the ecclesiastical issue presented, and the church was permitted to take a voluntary nonsuit of its petition.

On December 20, Harris Bank Hinsdale was advised by letter from counsel for the Tanios faction to continue to hold church bank accounts in their present frozen posture and not to honor checks or withdrawal requests without court authority. On December 22, Father

Sedrak sent a letter to the members of the Tanios faction purporting to "cancel" their membership on the board of deacons. On December 30, Father Sedrak issued a statement entitled, "To Whom It May Concern" identifying the six counterdefendants here as "the only official members of the board of deacons."

On January 9, 1990, the church filed a motion seeking leave to vacate its voluntary nonsuit and leave to file an amended complaint adding the Harris Bank Hinsdale as a party defendant. The amended complaint sought an accounting from the members of the Tanios faction, an order compelling them to turn over the books and records of the Chicago parish and an order requiring Harris Bank Hinsdale to honor the corporate resolution and letter of direction of Father Sedrak. The November 1989 bylaws were appended to this amended complaint as the church's true and correct bylaws. On January 16, the Tanios faction filed a motion to reconsider that portion of the order of December 18 which dismissed its amended counterclaim.

On February 1, the court vacated the Church faction's voluntary nonsuit and, on February 5, also granted the Tanios faction's motion to reconsider dismissal of its amended counterclaim. Both matters were set for trial. Two days after reinstatement of the cause, the members of the Tanios faction were "deposed" directly by Pope Shenouda III as clerical deacons of the Coptic Orthodox Church.

On April 30, 1990, following a bench trial, the court entered an order prepared by counsel for the Church faction. The court's order includes these findings: (1) the Coptic Orthodox Church is hierarchical in form; (2) the Chicago parish is a subordinate member parish of the Coptic Orthodox Church having been incorporated in Illinois as a religious corporation in patronage pursuant to the Religious Corporation Act; (3) the parish priest designated by the Mother Church (Mother Church) is president of the church board of deacons and the presiding officer of the Chicago parish; (4) that the Church, through the parish priest, and in conformity with the Religious Corporation Act, appointed the six members of the Church faction as the board of deacons and removed the five members of the Tanios faction as members of the board; (5) the August 1988 bylaws conflict with the teachings of the Coptic Orthodox Church and were never approved by the Mother Church; (6) the not-for-profit corporation formed in September 1988 never adopted the August 1988 bylaws, nor did it ever hold an election to establish a board; (7) the Tanios faction has physical possession of the books and records of the Church which it has improperly refused to turn over to the Church; (8) the members of the Tanios faction have been improperly representing themselves as deacons of

the church and have, without authority, collected donations from parishioners in the name of the church; and (9) Harris Bank Hinsdale currently has on deposit funds belonging to the Church and is also legal owner of the Church property as trustee.

In its order following the above findings, the court denied the Tanios faction's petition to declare the August 1988 bylaws to be binding on the Chicago parish and to declare the five of them to be members of the board of deacons. The court's order recognized the Church faction members to be the sole and exclusive members of the board of deacons and Father Sedrak as president of the board of deacons. All properties in the name of St. Mark's Coptic Orthodox Church of Chicago, including funds on deposit at the Harris Bank Hinsdale and all property in the land trust, were declared to be the property of the Chicago parish, and the Harris Bank Hinsdale was ordered to honor the corporate resolution prepared by Father Sedrak and the secretary and/or treasurer of the board of deacons with respect to all funds on deposit at the bank as well as the power of direction of the land trust.

The court also ordered the Tanios faction to turn over to Father Sedrak within seven days all the corporate books and other records of the Church, and its members were permanently enjoined from representing themselves as members of the board of deacons of the Chicago parish and of soliciting funds and/or donations on behalf of the Church. The Tanios faction was also ordered to submit to the Chicago parish an accounting of all funds which the Tanios faction had collected on behalf of or in the name of the church, including records from all depositories where the funds had been kept showing all amounts collected and all disbursements made. Thereafter, the Chicago parish was to be allowed leave to file a petition for a reimbursement to the Church for any funds improperly expended by the Tanios faction.

The court's order retained jurisdiction of the accounting matters and included a finding that there was no just reason for delay or enforcement of the appeal. At the time the court's order was entered, the Tanios faction noted that the order did not include a finding as to which bylaws govern the Chicago parish. The Church faction argued that such a ruling was unnecessary because the Religious Corporation Act vests authority in the Mother Church, and the court agreed with that position.

In this appeal, the Tanios faction contends the court erred in ruling in favor of the Church faction where (a) the Church faction's actions were in violation of the August 1988 bylaws and (b) were not authorized by the Religious Corporation Act. It argues first that the

court's finding that the 1988 bylaws do not govern the Chicago parish is against the manifest weight of the evidence.

The Church faction responds that the trial court lacked subject-matter jurisdiction under mandatory deference principles to declare the August 1988 bylaws to be binding on the Chicago parish or to declare the Tanios faction to be members of the board of deacons. The Tanios faction replies the court had subject-matter jurisdiction inasmuch as the dispute could be resolved utilizing the neutral-principles approach.

We find the trial court properly declined to declare that the August 1988 bylaws govern the Chicago parish and properly applied strict deference principles in ruling that the Church faction had control of the administrative and financial affairs of the Chicago parish.

■■ ■ The court, as a governmental agency of the State, is charged generally with the task of resolving disputes. Its authority to do so, however, in matters of internal church disputes, including those which concern the control or ownership of property, is narrowly circumscribed by the first amendment's guarantee that the right to the free exercise of religion will not be be abridged. (U.S. Const., amend. I; *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America* (1952), 344 U.S. 94, 113-16, 97 L. Ed. 120, 135-37, 73 S. Ct. 143, 153-55; see Hilliard, *Treading the Narrow Path: Internal Church Disputes in Illinois Courts*, 78 Ill. B.J. 92 (1990).) By reason of this limitation, civil courts have no authority to resolve church disputes which turn on matters of church doctrine, practice, polity or administration (*Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich* (1976), 426 U.S. 696, 710, 49 L. Ed. 2d 151, 163, 96 S. Ct. 2372, 2381; *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church* (1969), 393 U.S. 440, 449, 21 L. Ed. 2d 658, 665, 89 S. Ct. 601, 606). A corollary to this proscription is that where hierarchical religious organizations have established their own rules and regulations for internal discipline and government and have created tribunals for adjudicating disputes concerning the government and direction of subordinate bodies, civil courts are required under the first and fourteenth amendments to defer to decisions of such tribunals. *Milivojevich*, 426 U.S. at 724-25, 49 L. Ed. 2d at 171, 96 S. Ct. at 2387-88; *Kedroff*, 344 U.S. 94, 97 L. Ed. 120, 73 S. Ct. 143.

■■ ■ Where doctrinal controversy is not involved in a church dispute, however, mandatory deference to religious authority is not required by the first amendment, and the court may choose from a variety of approaches in resolving the dispute. (*Jones v. Wolf* (1979), 443

U.S. 595, 602, 61 L. Ed. 2d 775, 784, 99 S. Ct. 3020, 3025.) One such approach, the "neutral principles of law" approach, the approach identified in the Hull case (*Hull*, 393 U.S. at 449, 21 L. Ed. 2d at 665, 89 S. Ct. at 606) and unequivocally endorsed in *Jones* (443 U.S. at 602-03, 61 L. Ed. 2d at 784-85, 99 S. Ct. at 3025), has been recognized and, where appropriate, applied in Illinois. (See, *e.g., Aglikin v. Kovacheff* (1987), 163 Ill. App. 3d 426, 431; *York v. First Presbyterian Church* (1984), 130 Ill. App. 3d 611, 617; *Grace Evangelical Lutheran Church v. Lutheran Church-Missouri Synod* (1983), 118 Ill. App. 3d 151, 156.) Under the neutral-principles approach, the court objectively examines pertinent church charters, constitutions and bylaws, deeds, State statutes, and other evidence and resolves the matter the same as it would a secular dispute. *Jones*, 443 U.S. at 603, 61 L. Ed. 2d at 784-85, 99 S. Ct. at 3025; *York*, 130 Ill. App. 3d at 618.

A decided advantage of the neutral-principles approach is that it is flexible enough to be applied to all forms of religious organization and polity, "polity" being the specific form of church government. Three types of polity which have been recognized are congregational, presbyterial and episcopal.

"In the congregational form, each local congregation is self-governing. The presbyterial polities are representative, authority being exercised by laymen and ministers organized in an ascending succession of judicatories—presbytery over the session of the local church, synod over presbytery, and general assembly over all. In the episcopal form power reposes in clerical superiors, such as bishops. Roughly, presbyterial and episcopal polities may be considered hierarchical, as opposed to congregational polities, in which the autonomy of the local congregation is the central principle." (Note, *Judicial Intervention in Disputes over the Use of Church Property*, 75 Harv. L. Rev. 1142, 1143-44 (1962).)

Another advantage of the neutral-principles approach is that it does not presume that a local church has relinquished all power to a hierarchical body and leaves room for legal remedies which may, or should be, available to the local church. See *Aglikin*, 163 Ill. App. 3d at 431-42.

■ Application of the neutral-principles approach does not always allow civil court resolution of the dispute, however. It was recognized in *Jones v. Wolf* that if examination and interpretation of the documents pertinent to the dispute necessarily would entail deciding an issue of religious doctrine or church law, then the court must defer to

the resolution of the doctrinal issue by the authoritative ecclesiastical body. *Jones*, 443 U.S. at 604, 61 L. Ed. 2d at 785, 99 S. Ct. at 3026.

The Tanios faction argues here the court could have applied the neutral-principles approach in order to determine that the 1988 bylaws govern the Chicago parish. We disagree. Although the issue at bar incidentally involves the control of the church bank account and the power of direction over the land trust, the *ownership* of the church property is not in dispute (see, *e.g., Kelley v. Riverside Boulevard Independent Church of God* (1976), 44 Ill. App. 3d 673), but, rather, its control. The parties agreed during oral argument that the real questions presented here are: Who governs? And by what rules? Stated otherwise, which of the factions should be recognized as the true members of the board of deacons?

Although the court clearly heard sufficient evidence from which it could conclude the August 1988 bylaws were adopted by the board of deacons of the Chicago parish, the question of whether those bylaws "governed" the Chicago parish to the exclusion of the pope's authority to promulgate and approve bylaws and maintain the peace and welfare of the parish was an open one. As drafted and adopted, the 1988 bylaws were not "approved" by the pope due to the missing "indivisible and inseparable" language, and the record does not show the board ever reconsulted with counsel about adding this language or agreed to add it itself. In addition, uniform bylaws for the Coptic Orthodox Churches in North America were promulgated in September and November 1989 and ostensibly were meant to apply to all the parishes in the North American diocese. Bishop Serapian testified the September bylaws were suspended due to the appointment by the pope of the Synodical Committee for Coptic Orthodox Churches in Immigration to assist him in the drafting of the November 1989 bylaws.

■ In light of the evidence presented at trial, the question of whether the Chicago parish's 1988 bylaws *needed* to be approved and the question of which bylaws "governed" the Chicago parish at the time the various appointments and removals of board members occurred cannot be definitively answered using the neutral-principles approach. As counsel for the Tanios faction noted during the hearing on the motion to dismiss, bylaws were being written even as the instant civil case was proceeding.

In urging that the neutral-principles approach can be applied to the instant cause, the Tanios faction asserts that the evidence relating to the adoption and validity of the August 1988 bylaws was all of a secular nature, *i.e.*, minutes of the board of deacon meetings, the articles of incorporation, correspondence with the attorney general, etc. This

argument completely ignores, however, the hierarchical nature of the Coptic Orthodox Church. For example, assuming *arguendo* the 1988 bylaws were meant to amend those which were promulgated in 1969 for the governance of the North American diocese, it was stated in the 1969 bylaws that proposals for amendment approved in the Annual General Assembly of the local parish "should be submitted in writing to the General Board of the Church whose approval shall be final in that regard." According to the 1969 bylaws, each local parish was a member of the General Board of the Church in North America and was to be represented at Board meetings by the parish president and secretary. Tanios testified he did not know whether the General Board of the Church in North America ever existed, or met, and, during his tenure as parish secretary, he never attended or was asked to attend a meeting of that Board.

The 1978 version of the bylaws also contained an amendment-approval provision: "Any amendment to this constitution should be authorized by His Holiness the Pope of Alexandria and the Patriarch of the See of St. Mark." At trial, Bishop Serapian testified that a local parish which uses bylaws not approved by the pope or Holy Synod is not considered part of the Mother Church and that no parish is allowed to use bylaws before presenting them to the pope and getting his approval. Notwithstanding that, he also testified that many of the North American parishes had their own sets of bylaws which the pope and Holy Synod had never seen or approved. He further testified that if a local parish did not adopt the uniform bylaws promulgated by the church, there would be an investigation as to why such bylaws had not been adopted.

Even assuming the 1988 bylaws were not void *ab initio* for lack of approval by the Mother Church, do they "govern" the Chicago parish notwithstanding the subsequent promulgation in September and November 1989 of uniform bylaws for the Coptic Orthodox Church in North America and do they supersede the authority of the pope to appoint or remove members of the board of deacons? Bishop Serapian testified the pope has the authority to promulgate and approve bylaws for North America and that the pope is not obliged to present them to the Holy Synod. Further, the pope, as the bishop of the North American diocese, can take immediate action against parishioners or deacons who go against the dogma and order of the church in order to keep the welfare and peace of the parish, even before a trial by the clerical council of the parish is held. Appeal, if any, after such a trial is to the Holy Synod. Bishop Serapian testified the deposed members of the Ta-

nios faction would be tried after the instant court proceedings concluded.

■ In our opinion, resolution of the questions of who the true members of the board of deacons of the Chicago parish are and which bylaws govern it would require this court to delve, impermissibly, into matters of church doctrine and polity. "[W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." (*Milivojevich*, 426 U.S. at 709, 49 L. Ed. 2d at 162, 96 S. Ct. at 2380.) In *Milivojevich*, one of the issues presented was the defrockment of Bishop Dionisije. Resolution of the dispute over the defrockment was determinative of the control of church property. The Illinois Supreme Court determined the defrockment must be set aside because it was "arbitrary," that is, the church's defrockment of the bishop was not done according to the court's interpretation of the church's constitution and penal code.

The United States Supreme Court reversed, finding that the Illinois Supreme Court had impermissibly rejected the church's defrockment decision and substituted its own inquiry into church polity and resolutions based thereon. " '[C]ivil courts do not inquire whether the relevant [hierarchical] church governing body has power under religious law [to decide such disputes].' " (*Milivojevich*, 426 U.S. at 708, 49 L. Ed. 2d at 162, 96 S. Ct. at 2380, quoting *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.* (1970), 396 U.S. 367, 369, 24 L. Ed. 2d 582, 584, 90 S. Ct. 499, 500.) Similarly here, the pope's power to appoint and depose the various parties here as deacons not only should not be inquired into consistent with *Milivojevich*, but, further, such an inquiry would lack any guidelines whatever—no matter how impermissible the inquiry—inasmuch as the question of which bylaws "govern" is constitutionally unascertainable in this civil forum.

■ We further believe that the principle of mandatory deference has application here despite the Tanios faction's argument that it cannot be utilized because the Holy Synod has not ruled on the issues being litigated in the instant cause. All parties concede the Holy Synod is the highest judicatory of the Coptic Orthodox Church. As noted previously, however, the authority of the Coptic Orthodox Church is vested in a series of ascending ecclesiastical judicatories: synod, pope, bishop, priest, deacon. The rule of mandatory deference in church property

disputes set forth in *Watson v. Jones* (1872), 80 U.S. 679, 727, 20 L. Ed. 666, 676, states:

> "[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories *to which the matter has been carried,* the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (Emphasis added.)

■ It is clear from the events subsequent to the Chicago parish's adoption of the 1988 bylaws that the pope did not approve of those bylaws as drafted and did not approve of the actions engaged in by the Tanios faction. Accordingly, the pope acted to promulgate uniform bylaws, to reduce the Tanios faction's influence on the board by authorizing the appointment of additional board members, and, finally, to depose the Tanios faction entirely from the board of deacons. With the cause presented to the court in that posture, the court, consistent with first and fourteenth amendment principles, properly deferred to the pope's decisions which Bishop Serapian testified were valid pending trial pursuant to church practice. As such, we do not believe it was necessary for the matter to have been decided by the Holy Synod before mandatory deference principles became applicable. Certainly nothing in this court's decision would prevent the Tanios faction from pursuing the matter further within the church hierarchy.

In sum, we conclude the court did not err in refusing to declare that the 1988 bylaws govern the Chicago parish.

The Tanios faction's second argument is that the court's finding that the Church's actions were authorized under the Religious Corporation Act was erroneous.

The court found that the Chicago parish was incorporated in Illinois as a "religious corporation in patronage" pursuant to "Section [*sic*—par.] 176, *et seq.*" of the Religious Corporation Act. (Ill. Rev. Stat. 1989, ch. 32, par. 176 *et seq.*) Accordingly, it found that the Church, "through the parish priest, and in conformity with the *Religious Corporation Act,*" selected counterdefendants Nessim, Aboutar, Moawad, Menias, Ibrahim and Khalil to be members of the board of deacons and, further, that the Church "through the parish priest, and in conformity with the *Religious Corporation Act*" removed members of the Tanios faction from the board. (Emphasis in original.)

■ In Illinois, any church, congregation or society "formed for the purposes of religious worship" may incorporate (thus becoming a religious corporation). (Ill. Rev. Stat. 1989, ch. 32, pars. 164.) Any congregation, church or society "which is under the patronage, control,

direction or supervision of any ecclesiastical body, diocesan, or like ecclesiastical officer, agreeably to the laws thereof" may also become incorporated (thus becoming a religious corporation in patronage). (Ill. Rev. Stat. 1989, ch. 32, pars. 176.) Not-for-profit corporations for religious purposes may also be organized under the provisions of the General Not For Profit Corporation Act of 1986 (thus becoming a not-for-profit corporation) (Ill. Rev. Stat. 1989, ch. 32, par. 101.01 *et seq.*).

 The Chicago parish was incorporated as a religious corporation in 1982 when it filed its affidavit of organization with the Du Page County recorder of deeds pursuant to section 36 of "An Act concerning corporations" (the Religious Corporation Act) (Ill. Rev. Stat. 1981, ch. 32, par. 165). We agree with the Tanios faction that the inclusion of the sentence "Permission of the Patriarch's representative was obtained" does not in itself convert the Chicago parish's incorporation as a religious corporation under section 35 to that of a religious corporation in patronage as provided for in section 46a (Ill. Rev. Stat. 1989, ch. 32, pars. 164, 176). Section 51 of the Religious Corporation Act provides that an affidavit of incorporation filed under either section 36 (relating to religious corporations) or 46b (relating to religious corporations in patronage) may include a notation that the permission required before the subordinate body of the organization could incorporate was obtained. Ill. Rev. Stat. 1989, ch. 32, pars. 188, 165, 177.

 Thus, the court's finding that the appointment and removal of the various board members by the Church, through the priest, was "in conformity" with its status as a religious corporation in patronage was error. We do not believe it was reversible error, however, first, because the court's finding was stated in the alternative ("*and* in conformity with the Religious Corporation Act") and, second, under the general principle that a court's order may be affirmed on any basis justified by the record (*Zonta v. Village of Bensenville* (1988), 167 Ill. App. 3d 354). The reasons given by the trial court for an order, or the findings upon which it is based, are not material if the order is correct. (*Cencula v. Keller* (1989), 180 Ill. App. 3d 645; *Fischer v. Mann* (1987), 161 Ill. App. 3d 424.) Based on the mandatory deference principles discussed above, we believe the court's order was correct notwithstanding its erroneous finding as to the corporate status of the Chicago parish.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

DUNN and NICKELS, JJ., concur.