APOSTOLIC NEW LIFE CHURCH OF ELGIN, Plaintiff-Appellant, v. BERNARDO DOMINQUEZ *et al.*, Defendants-Appellees.

Second District   No. 2—96—1111

Opinion filed October 28, 1997.

George E. Faber, of Faber & Buehler, P.C., of West Dundee, for appellant.

Bruce D. Strom, of Strom, Repay & McCutchan, of Elgin, for appellees.

JUSTICE DOYLE delivered the opinion of the court:

Plaintiff, Apostolic New Life Church of Elgin, appeals from the order of the circuit court of Kane County entering judgment in favor of defendants, Bernardo Dominquez, Erminia Deleon, Rafael Rivera, and Mision Apostolica De La Fe En Cristo Jesus and against plaintiff. On February 3, 1993, plaintiff filed a complaint seeking to eject defendants from property, consisting of a church building, church parking lot, and church parsonage, located at 280-288 Franklin Boulevard in Elgin. The complaint also sought an injunction to prohibit the individual defendants and the defendant church from using the premises. The complaint further alleged unjust enrichment to defendants and demanded an accounting.

On March 18, 1993, defendants filed their motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction, standing, and *laches*. On July 6, 1993, in an opinion letter, the court denied defendants' motion to dismiss finding that, while some issues might be improper for review by a civil court, the primary thrust of the complaint involved the control of church property and could be analyzed by a "neutral principles of law" approach. Defendants filed a motion for reconsideration and clarification, which was subsequently denied.

On September 29, 1994, plaintiff filed a motion for preliminary injunction, which was denied by opinion letter issued on February 9, 1995. The case was set for trial. At a subsequent pretrial conference the parties and the trial judge agreed that the case would be heard as a stipulated bench trial and that the judge would decide the matter based on the stipulation of facts entered into by the parties and the briefs submitted by counsel. Sometime thereafter, the case was reassigned to a different judge. On August 21, 1996, that judge ruled against plaintiff, making no findings of fact or conclusions of law. Plaintiff filed a timely notice of appeal.

As derived from the stipulation of facts entered into by the parties and the exhibits offered by each side, the facts are as follows. In 1979 a small group of individuals began meeting in the home of defendant Erminia Deleon in Elgin as a Bible study group. Twice, dur-

ing the 1980s, the congregation decided to affiliate with the Apostolica Assembly De La Fe En Cristo Jesus (Apostolic Assembly), which had its main offices in California. The congregation affiliated without filing articles of merger or taking any formal action other than a majority vote to join. Also, twice, the majority of the congregation determined to leave the Apostolic Assembly.

In August 1988, the congregation incorporated as Apostolic New Life Church of Elgin (NLC), an Illinois religious corporation. It prepared a constitution and bylaws. During this time Leobardo Bustos became the pastor. Also, in 1988, members of the congregation decided to investigate the possible purchase of property for a church.

In February 1989, NLC purchased property at 280-288 Franklin Street in Elgin, consisting of a church building, parking lot, and parsonage, for $140,000. NLC applied for and received a mortgage in the amount of $90,000. Three members of the congregation personally guaranteed the loan.

The new property was to be dedicated in September 1989, and an invitation was extended to Miguel Reyes, the President Bishop of Iglesia Apostolica De La Fe En Cristo Jesus (IAFCJ) in Mexico, the parent church of the Apostolic Missions in the United States, to attend the dedication ceremony. Bishop Reyes was unable to attend but sent Victor Soto from Mexico and Rafael Rivera from the United States to represent IAFCJ at the ceremony. From February 1989 to January 1990 the members of NLC, who were mostly Spanish speaking, conducted regular religious services from their church in Elgin. The church collected funds and tithes from its members.

On January 28, 1990, Bishop Reyes came to NLC with a petition from Mexico inviting the local church to become part of the Mexican parent church's hierarchy. A meeting of the congregation was held on that date and a vote taken regarding affiliation with the parent church. The vote was 42 in favor, 0 opposed, and 3 abstentions. The petition provided in part:

> "We accept as Biblical the system of organization of the IAFCJ and are in agreement to observe all of its parts, beginning by putting ourselves from this day under the authority of the President Bishop and/or the supervisors that the same designates, as long as these are under the supervision of the IAFCJ of Mexico."

Bishop Reyes hand carried the petition back to Mexico, where it was accepted by the parent church and confirmed by letter on February 5, 1991. Immediately following NLC's decision to join IAFCJ, the local church began holding itself out to the public and its members as Mision Apostolica De La Fe En Cristo Jesus (MA). All the members of the church remained, generally, the same. When new members

joined the church, they were given MA membership certificates. The doctrines of the church never changed.

Bishop Reyes sent to Leobardo Bustos baptism certificates, marriage certificates, and letterhead, all of which bore the name of Mision Apostolica De La Fe En Cristo Jesus on them. Bustos received a license as a minister of MA, and both he and the church were listed in the Mexican parent church's directory. All internal church reports as well as other actions taken by the church, such as the sale of a church van and rental of retreat facilities, were made in the name of MA. Additionally, the church had a bank account in the name of MA and posted a sign on the church building reading "Mision Apostolica De La Fe En Cristo Jesus." On April 25, 1991, Mision Apostolica De La Fe En Cristo Jesus USA (MA USA), with its principal office in Texas, filed an application for certificate of authority to conduct affairs in Illinois under the General Not For Profit Corporation Act of 1986 (805 ILCS 105/101.01 et seq. (West 1994)). The application was signed by Reverend Rafael Rivera, as president of the corporation, and named Leobardo Bustos as the corporation's registered agent in Illinois.

In July 1991, MA requested help from the Mexican parent church to resolve some problems in the local church. The parent church appointed a commission to investigate, and, in August 1991, Bustos met with Bishop Reyes and Rivera in Mexico to review the situation. The parent church recommended that Reverend Bustos be reassigned to another church and a new minister appointed. This action was never taken.

On March 5, 1992, the Illinois Department of Revenue granted a property tax exemption to MA, which Bustos had applied for in 1991.

On March 8, 1992, Bustos died, and authorities in the Mexican parent church sent Rivera from MA USA to MA in Elgin to be the church's transitional pastor. Upon his arrival in Elgin late in March or early in April, Rivera began reviewing materials to ensure the proper transfer of NLC's title, deeds, financial matters, and other items into the name of MA as instructed by the Mexican parent church.

On April 4, 1992, a meeting of the congregation took place to transfer title on the church property and to refinance the mortgage. The members approved by vote to take these actions. As the bank required more formal minutes of the meeting authorizing the transfer of the real property, the congregation met again on July 11, 1992, to reaffirm the actions taken in April. By a vote of 35 to 22, the congregation voted to dissolve NLC, to transfer all real estate of the former organization to MA, and to refinance the mortgage.

A number of members of NLC tried to set aside the actions which occurred at the April and July meetings. They sent out a notice of a meeting to be held on October 17, 1992. At the meeting it was determined by a majority vote that the congregation had affiliated with MA in January 1990. Following this determination, defendants Bernardo Dominquez, Erminia Deleon, and Rafael Rivera were elected to the board of directors of MA pursuant to MA's constitution and bylaws. On October 26, 1992, Rivera filed an affidavit of dissolution, purporting to dissolve NLC. Also, on this date, MA incorporated under the Religious Corporation Act (805 ILCS 110/0.01 *et seq.* (West 1994)) and the church property, which had been transferred by quitclaim deed from NLC to MA on May 30, 1992, was recorded. In November 1992, NLC was released from the mortgage, and it was assumed by MA.

On November 14, 1992, 33 members of the former NLC met in Elgin and elected a board of directors. On November 22, the board of directors held a special meeting. During that meeting, the directors adopted several resolutions. They resolved, among other things, that Rivera be removed as pastor of the church located at 280-288 Franklin Boulevard; that any and all directors and officers elected or appointed by Rivera be removed; that any actions taken by Rivera, the directors, and officers be vacated and set aside; and that the newly elected directors of NLC take whatever action was necessary, including legal, to carry out the resolutions.

On February 3, 1993, the plaintiff filed its complaint, asserting that it had not transferred or conveyed the church property, that Rivera had installed himself as pastor without authority to do so, that he had purported to change plaintiff's name to MA, that he took physical possession of plaintiff's realty without any authority to do so, that he used and continued to use plaintiff's realty and plaintiff's funds for purposes other than those to benefit plaintiff, and that, as a direct and proximate result of one or more of these acts, defendants wrongfully occupied plaintiff's real estate and used plaintiff's funds without authority to do so. Plaintiff sought an injunction against defendants as well as an accounting of and repayment of funds used by defendants.

In March 1993, NLC reincorporated as an Illinois not-for-profit corporation.

On August 21, 1996, the trial court entered judgment in favor of defendants and against plaintiff. This appeal ensued.

On appeal, plaintiff raises a number of issues, which we have combined into one main issue as follows: whether the decision of the majority of the members of an independent congregational church,

incorporated as a religious corporation, to join with and transfer its property to a hierarchical church organization may be set aside because the joinder or union failed to comply with corporate merger law pertaining to joinder or union of churches. Stated simply, the issue is which faction of the formerly united NLC congregation is entitled to possess and enjoy the property located at 280-288 Franklin Street in Elgin. Defendants maintain that NLC submitted to the authority of IAFCJ, the hierarchical body, when it voted and signed a petition on January 28, 1990, to affiliate or reunite with the IAFCJ and that the Mexican parent church's subsequent acceptance of the petition provided the authorization for NLC's name change to MA, NLC's dissolution, and the transfer of NLC's church property and assets to MA. We agree.

■ The role civil courts may play in resolving church property disputes is severely circumscribed by the first amendment's guarantee that the right to the free exercise of religion will not be abridged (U.S. Const., amend. I). *Jones v. Wolf*, 443 U.S. 595, 602, 61 L. Ed. 2d 775, 784, 99 S. Ct. 3020, 3025 (1979); *Hines v. Turley*, 246 Ill. App. 3d 405, 417 (1993). Because of this limitation, civil courts have no authority to resolve church property disputes that turn on matters of church doctrine, practice, polity, or administration. *St. Mark Coptic Orthodox Church v. Tanios*, 213 Ill. App. 3d 700, 713 (1991). But, where these matters are not involved in a church property dispute, the court may choose from a variety of approaches in resolving the dispute. 213 Ill. App. 3d at 713. Among these approaches is the "neutral principles of law" endorsed in *Jones* (443 U.S. at 602-03, 61 L. Ed. 2d at 784-85, 99 S. Ct. at 3025) and recognized and, where appropriate, applied in Illinois. *Tanios*, 213 Ill. App. 3d at 714.

■ Under the neutral principles approach, the court objectively examines pertinent church charters, constitutions and bylaws, deeds, state statutes, and other evidence to resolve the matter the same as it would a secular dispute. *Hines*, 246 Ill. App. 3d at 418. The approach may be applied in resolving property disputes, even within a hierarchical church organization, so long as the court need not decide a religious matter involving church doctrine, polity, or practice. *Clay v. Illinois District Council of the Assemblies of God Church*, 275 Ill. App. 3d 971, 976-77 (1995). In the present case, the substantive matter raised is who owns and controls the church property located at 280-288 Franklin Street, and it can be resolved by applying the neutral principles approach.

■ NLC is a religious corporation formed under the Religious Corporation Act (805 ILCS 110/0.01 *et seq.* (West 1994)). MA is a not-for-profit corporation doing business in Illinois under the General

Not For Profit Corporation Act of 1986 (General Not For Profit Corporation Act) (805 ILCS 105/101.01 *et seq.* (West 1994)). The Religious Corporation Act contains no provision that applies to the merger of a religious corporation and a general not-for-profit corporation, nor does the Act contain any provision pertaining to the dissolution of a religious corporation. Although the General Not For Profit Corporation Act addresses mergers and dissolutions, those provisions are inapplicable to the union of NLC and MA and to the dissolution of NLC. Section 101.70 of the General Not For Profit Corporation Act (805 ILCS 105/101.70 (West 1994)) lists the domestic corporations to which it applies. A corporation formed under the Religious Corporation Act, such as NLC, is not included in the list. Consequently, the merger and dissolution provisions of the Religious Corporation Act cannot be relied upon in analyzing the present case.

Additionally, the Merger of Not For Profit Corporations Act (Merger Act) (805 ILCS 120/0.01 *et seq.* (West 1994)), which pertains to the merging or consolidating of two or more not-for-profit corporations, including religious corporations, is equally inapplicable to the joinder or union of NLC and MA because of section 10a of the Merger Act (805 ILCS 120/10a (West 1994)). That section, which specifically provides that the Merger Act does not apply to corporations subject to the provision of the General Not For Profit Corporation Act of 1943 (Ill. Rev. Stat. 1985, ch. 32, pars. 163a37 *et seq.*), also exempts corporations, such as MA, subject to the 1986 General Not For Profit Corporation Act. See *Rural Electric Convenience Cooperative Co. v. Soyland Power Cooperative, Inc.*, 239 Ill. App. 3d 969, 976-77 (1992).

Likewise, the Religious Educational or Charitable Corporation Dissolution Act (805 ILCS 135/0.01 *et seq.* (West 1994)) has no application to the present case, as the Act applies only to educational or charitable corporations. No evidence was presented to show that NLC constituted a charitable organization whose dissolution would come under the auspices of this act.

■ We conclude that the merger or union of NLC and MA and the dissolution of NLC were not controlled by any statute. Therefore, we turn next to an examination of the pertinent church charters and constitutions and bylaws. We note first that no church charters appear among the documents presented to the trial court or included in this record, and, therefore, we must presume none exists. While the constitution and bylaws of NLC contain no express provision authorizing a merger or a reunion of the church with another church organization or the dissolution of NLC, the documents also contain no express inhibition against such reunion or dissolution. The constitution and bylaws of IAFCJ, the parent church of the Apostolic Mis-

sions in the United States, under whose auspices MA would come, are completely in Spanish. No English translation appears in the record although English translations were provided for the majority of the other documents written in Spanish and presented to the trial court. It is impossible, therefore, to determine from the constitution and bylaws of IAFCJ whether these documents address the question of the merger or reunion of an independent church with the Mexican parent church and the dissolution of the independent church. As any doubts arising from the incompleteness of the record are to be resolved against the appellant (*Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984)), we must resolve any doubts regarding the contents of the documents against NLC.

As there appears to be no express constitutional limitation regarding the subject of reunion or merger, the right of reunion must be held to exist. *Cf. First Presbyterian Church v. First Cumberland Presbyterian Church*, 245 Ill. 74, 100-01 (1910).

Documents do exist in the record which shed light on the merger and dissolution issues. Noteworthy is the petition signed by members of NLC on January 28, 1990, after the members voted 42 to 0 with three abstentions to reincorporate with IAFCJ, the Mexican parent church. That petition declared that many members of the congregation had been raised in the IAFCJ; that, in the past, they had felt the need to leave that corporation; and that, now, they sought to reunite themselves with the IAFCJ having experienced "the emptiness" in not being incorporated and protected by the IAFCJ. The members committed themselves to:

"1. Continue obeying the doctrinal points that the IAFCJ of Mexico states in the constitution of the church.

2. Continue observing the disciplinary [*sic*] that the same IAFCJ states in the constitution of the church and in the manual of ceremonies of this institution.

3. [P]ut[ ] ourselves from this date under the authority of the President Bishop and or the supervisors that the same designates, as long as these are under the supervision of the IAFCJ of Mexico.

4. [O]bey the economic system of the IAFCJ where it refers to sustaining the ministry of the church through tithing and offerings ***.

5. [T]ake the necessary steps for the title to be changed to the title of: Iglesia Apostolica De La Fe En Jesus Cristo El Senor or at least that both titles shall be registered together. This will be done to the end of continuing to be identified in our title with the church from where we originated ***."

The IAFCJ received the petition of NLC to reincorporate with the Mexican parent church and confirmed its acceptance of the peti-

tion in a letter, dated February 5, 1991, to Reverend Rafael Rivera, president of the Apostolic Missions in the United States. In that letter the President Bishop of IAFCJ instructed Rivera to have the present pastor of NLC, Leobardo Bustos, change the title of NLC as well as the deeds of the property, the checking account, the registry of signatures, and any other necessary changes to the Apostolic Mission of the Faith in Jesus Christ (IAFCJ).

Immediately following the petition on January 28, 1990, NLC began holding itself out to the public and to its members as MA, one of IAFCJ's mission churches. All internal church reports and other actions taken by the church, such as rental of retreat facilities, applying for a Sam's card, and selling of a church van, were made in the name of MA. Additionally, a bank account in the name of MA was established, and the sign posted on the church building was changed to MA. Printed baptism certificates, marriage certificates, recommendation forms, letterhead, and other printed matters were sent to Reverend Bustos. Bustos requested licensure as a minister of MA and was issued a license. Both Bustos and the church were listed in the Mexican parent church's directory. By this conduct, the congregation acknowledged that it had become an integral part of IAFCJ.

Following the signing of the petition, all members had remained generally the same. When new members joined, they were issued membership certificates in the name of MA rather than NLC. The doctrines of NLC and MA never changed but remained the same.

Although Bustos applied in July 1991 to the Illinois Department of Revenue for a property tax exemption on the church and parsonage, naming MA as owner of the property, title to the property was not changed from NLC to MA. In March 1992 the property tax exemption was granted. Also, in March 1992, Bustos died. As a result, the Mexican parent church sent Rivera to MA as its transitional pastor.

Upon his arrival, Rivera learned that, while the sign on the church had been changed, all documents had been changed, and the Illinois Department of Revenue had granted a property tax exemption for MA, the actual title to the church property had not been changed, and the church was paying a very high rate of interest on the mortgage. According to the affidavits of defendant Erminia Deleon, who was treasurer at the time Rivera arrived, and Bernardo Dominquez, who was an officer of the church, Rivera suggested that the property should be refinanced. In her affidavit Deleon attested that to refinance the property the bank required that the old church (NLC) be dissolved and title to the property be transferred to MA.

Rivera held a meeting of the congregation on April 4, 1992, to approve a transfer of title to the real property and to refinance the mortgage. The majority of those present voted to approve these items and to approve the dissolution of NLC. An affidavit of dissolution signed by Rivera states that a resolution was passed on April 4, 1992, "in accordance with the rules and usages" of NLC to officially dissolve NLC. With no evidence before us to convince us otherwise, we must presume that Rivera's statement is true and that the members of NLC voted to officially dissolve the religious corporation.

Because the bank handling the refinancing of the mortgage wanted clearer authorization of the transfer of the real property, another meeting of the congregation was held on July 11, 1992, to reaffirm the actions taken in April. The minutes of that meeting reveal that a formal resolution, resolving that NLC shall be known as "Mission Apostolica De Ne [sic] La Fe En Cristo Jesus," that the corporation NLC shall be dissolved, and that all real estate owned by NLC shall be transferred, passed by a vote of 35 to 22.

Absent some indication to the contrary, majority rule is generally employed in the governance of religious societies. *Jones v. Wolf*, 443 U.S. 595, 607, 61 L. Ed. 2d 775, 787, 99 S. Ct. 3020, 3027 (1979). Here, where no state statute governs the voting percentage in the present case and no provision of NLC's constitution and bylaws pertains to a voting percentage needed to pass a resolution, we find that majority rule was sufficient to pass any resolution on which the members of the congregation voted. To support our finding we note that past policy indicated that the congregation decided matters by majority vote. For example, the record reveals that twice during the 1980s the congregation had decided by majority vote to join the Apostolica Assembly De La Fe En Cristo Jesus in California and twice had decided to leave the organization.

The July 11, 1992, vote served as an affirmation of what the members of the congregation had already decided on April 4, 1992, *i.e.*, to transfer the title of the real property of NLC to MA and to formally dissolve the religious corporation known as NLC. The record shows that the transfer of title occurred on May 30, 1992, when "pursuant to authority given by the members" of NLC, NLC conveyed and quitclaimed the church property to MA. Signing on behalf of NLC were Rivera as pastor of NLC and Isaac Plazola as secretary.

Plaintiff maintains that the transfer of the real estate was invalid because, by his own admission at his deposition and as set forth in the stipulation of facts, Rivera had never been a member or a pastor of NLC. According to NLC's bylaws, it was the duty of the president and secretary of the corporation to administer all property

belonging to the congregation, to negotiate contracts, and to sign all documents. Consequently, plaintiff asserts, since Rivera was neither pastor nor a member of NLC, he was not authorized to sign the deed. Therefore, the deed was invalid, and the property still belongs to NLC. The resolution of the property issue, however, requires us to do more than simply examine the deed conveying the property. The affidavits of Deleon and Dominquez, who were actively involved in NLC, reveal that they were unaware that the church had any bylaws or constitution since they never saw these documents or used them at their meetings. Consequently, whether the provisions of the documents were ever adhered to is questionable.

Nonetheless, NLC did not function as a separate entity from the moment the members of the congregation in January 1990 voted to reunite with the Mexican parent church and began holding themselves out to the public as one of the parent church's Apostolic Missions in the United States. Rivera could not have been a member of NLC or its pastor because by the time he arrived in Elgin in March 1992 NLC had been officially accepted into the parent church's hierarchy and had been acting as a subordinate member of that general organization known as IAFCJ. The old church, NLC, arguably, had become a nonentity and ceased to exist, and only one church, MA, existed in 1992, of which Rivera was pastor.

From the record before us, the reunion of NLC with the Mexican parent church appears to have been effected in accordance with the laws and usages of both churches in a legal manner. NLC voted by majority vote in January 1990 to reincorporate or reunite with IAFCJ and to put itself under the authority of the President Bishop and other supervisors of the IAFCJ. The members signed a petition to that effect on that day, and that petition was subsequently accepted by the Mexican parent church. In that acceptance letter, the President Bishop referred to the fact that a majority of the congregation had agreed to abide by the instructions of IAFCJ whether given directly or through its legal representative in the United States (Rivera). The President Bishop directed that immediate steps be taken to change the title of the church, the deeds of the church property, the checking account, the registry of signatures, and any other necessary changes to the Apostolic Mission of the Faith in Jesus Christ (IAFCJ). Whether provisions of IAFCJ's constitution conferred title or right of control to the property of a local religious body which chose to affiliate or reunite with the parent church is not evident since the constitution is in Spanish. Therefore, we must presume that nothing in its constitution precluded IAFCJ from directing that the deed of the church property should be changed to MA.

The votes on April 4, 1992, and July 11, 1992, confirmed what the members of the congregation had decided in January 1990, *i.e.*, to surrender their former name, NLC, and to transfer their membership to the present church. The decision meant that NLC had agreed to come under the direction of the parent church. This decision was verified on October 17, 1992, when the congregation decided by majority vote that it had become affiliated with MA on January 28, 1990. The congregation passed a resolution declaring that it had previously affiliated "in total" with Mision Apostolica De La Fe En Cristo Jesus and had come under its direction. Such a merger was decided by the majority of the congregation as demonstrated by the aforementioned votes. Consequently, the reunion or reincorporation of NLC into the Mexican parent church was not invalid, even though it amounted practically, but not legally, to a merger. See *First Presbyterian Church*, 245 Ill. at 114-18.

The neutral principles approach is flexible and may be applied to all forms of religious organization and polities, *i.e.*, specific forms of church government. *Hines v. Turley*, 246 Ill. App. 3d 405, 418-19 (1993). Prior to its decision to affiliate, or reincorporate, with the Mexican parent church, NLC's polity was congregational, which means the congregation was strictly independent of other ecclesiastical associations and, where church governance was concerned, owed no obligation to any higher authority. 246 Ill. App. 3d at 419. However, in voting to reunite with IAFCJ, the members of NLC relinquished their independence and became part of a larger, hierarchical organization. A hierarchical polity has been defined as one

> "where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." *Watson v. Jones*, 80 U.S. (Wall.) 679, 722-23, 20 L. Ed. 666, 674 (1872).

The neutral principles approach does not presume that the local independent church has relinquished all power to a hierarchical body and leaves room for legal remedies which may, or should be, available to the local church. *Tanios*, 213 Ill. App. 3d at 714.

Here, however, from our examination of the constitutions and bylaws, state statutes, the deed conveying the church property in question, and other evidence, we conclude the old church did relinquish its hold on the property. An examination of the first two items yields little which is helpful in resolving the present dispute as

891

discussed earlier in this disposition. But, our analysis of the deed and other documentary evidence, such as the minutes of the meetings, affidavits, NLC's petition to affiliate with IAFCJ, and the parent church's subsequent acceptance of NLC's decision to reunite with the parent church, persuades us that no corporate law or merger was required for the reunion; that, as of January 28, 1990, the NLC congregation chose to reunite with the parent church and come under its direction; that, on April 4, 1992, the congregation subsequently voted to change title to the church property and to dissolve NLC; and that the title change and dissolution were valid.

Accordingly, we affirm the judgment of the circuit court of Kane County.

Affirmed.

BOWMAN and HUTCHINSON, JJ., concur.