885 P.2d 361

John H. O'CONNOR, Plaintiff–Appellant,

v.

The DIOCESE OF HONOLULU, a non-profit religious corporation, Joseph A. Ferrario, individually and as Bishop, Joseph Bukoski, III, individually and as Judicial Vicar, Defendants–Appellees, and Doe Defendants 1–100, Defendants.

No. 17546.

Supreme Court of Hawai'i.

Nov. 23, 1994.

Reconsideration Denied Dec. 8, 1994.

Joseph A. Ryan, Honolulu, for plaintiff-appellant.

William H. Gilardy, Jr. (John R. Aube, with him on the brief, of Watanabe, Ing &

Kawashima), Honolulu, for defendants-appellees. `

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Plaintiff-appellant John J. O'Connor appeals from an order granting a motion to dismiss his complaint against defendants-appellees "The Diocese of Honolulu" (the Diocese),[1] Joseph A. Ferrario, then-Bishop of the Diocese, and Joseph Bukoski, III, Judicial Vicar of the Diocese (collectively, appellees). For reasons discussed below, we affirm.

## I. FACTUAL BACKGROUND

This case involves a dispute primarily between O'Connor and Ferrario. O'Connor published a newspaper called *The Catholic Lay Press,* a paper he characterized as "printing the truth and ... in competition with the Bishop."[2] In the course of a dispute in which O'Connor and others were faced with the prospect of excommunication, Bishop Ferrario wrote to O'Connor stating:

> If you are no longer associated in any way with the schismatic group of Our Lady of Fatima Chapel ... then you are still required by Canon Law, to present yourself to me individually and in person ... to provide evidence that:
>
> 1. You have ceased the publication, "The 'Catholic' Lay Press" or have removed from the mast head the adjective, "Catholic" and the phrase, "a Traditional *Roman Catholic* Family Newspaper Loyal to the Holy Father";
>
> 2. You will give a profession of faith in my presence whereby you reject any and all association with Archbishop Marcel Lefebvre, his excommunicated bishops as well as the rejection of the St. Pius X Society movement;
>
> 3. You will give an oath of obedience and loyalty to me as the diocesan bishop of Honolulu, since in communion with the Holy Father, I represent the Roman Catholic Church in the State of Hawai'i in all matters of faith and morals.
>
> If you are not associated with the schismatic group but continue to publish without omitting the aforementioned # 1, then you will still be subject to a penal sanction but not that of excommunication unless you are still actively involved with the schismatics through your publication which does not have ecclesiastical approbation. . . .

Apparently, O'Connor did not comply with the demands of Ferrario, as he was excommunicated, along with others.

In a seven count prolix complaint, O'Connor essentially alleged that: (1) he was wrongly excommunicated from the Roman Catholic Church; (2) the allegations leading to his excommunication were false; (3) appellees published the fact of his excommunication and made false statements about him; and (4) appellees engaged in acts that violated his rights to freedom of the press, freedom of speech, freedom of worship, and freedom to associate with others. Thus, O'Connor claimed that: (1) he was defamed by appellees; (2) appellees engaged in unfair and deceptive acts and practices and monopoly in violation of Hawai'i Revised Statutes (HRS) § 480–2; (3) Ferrario deceived and defrauded him and others; (4) appellees committed clergy malpractice; (5) the Diocese was liable for the acts of Ferrario and Bukoski under the doctrine of respondeat superior; and (6) the Diocese was negligent. O'Connor claimed that the acts of appellees caused him physical and mental suffering, loss of income, and other harm for which he should be compensated with general, special, punitive, and statutory treble damages. Throughout his complaint, O'Connor accused Ferrario of criminal activity, apparently of-

---

**1.** Several of appellees' filings, beginning with the Motion to Dismiss, urge that "The Diocese of Honolulu" is an improper name; the proper name of the organizational defendant is "The Roman Catholic Church in the State of Hawai'i." Appellees, however, did not seek to amend the captions or to dismiss for failure to name a necessary party. Thus, for purposes of consistency with the caption of this case, we will utilize the phrase "The Diocese of Honolulu."

**2.** The Bishop published a newspaper called *The Catholic Herald.*

fered to show that O'Connor's publication of such activity in *The Catholic Lay Press* provided an improper motive for O'Connor's excommunication. Relevant details of some of the claims are set forth below.

Appellees moved, under Rules 12(b)(1) and (6) of the Hawai'i Rules of Civil Procedure (HRCP), to dismiss the complaint. Appellees argued that the circuit court lacked jurisdiction "pursuant to the ecclesiastical abstention doctrine," a rule of constitutional law that, according to appellees, prohibits civil courts from entertaining "collateral civil suits against ecclesiastical officers for injuries arising from ecclesiastical acts."

After reviewing appellees' motion, the materials submitted in support and in opposition thereto, and hearing the arguments of counsel, the circuit court dismissed O'Connor's complaint with prejudice.[3]

## II. *ISSUES*

Together, the parties phrase six issues. We consolidate and rephrase them as:

Whether O'Connor's claims are barred from civil adjudication by the first and fourteenth amendments to the United States Constitution and article I, section 4 of the Hawai'i Constitution; that is, whether a state court can decide O'Connor's claims without resolving underlying controversies over religious doctrine, church law, or church governance.

Hawai'i's appellate courts have not addressed a similar question in any prior published opinion.

## III. *STANDARD OF REVIEW*

The circuit court did not state a reason for its dismissal; it simply granted appellees' motion to dismiss. However, appellees' motion was premised on and argued as a claim

that the circuit court lacked subject matter jurisdiction. We therefore review it as such.

A trial court's dismissal for lack of subject matter jurisdiction is a question of law, reviewable *de novo*.... Our review is based on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff. Dismissal is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.... [W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the [trial] court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction.

*Norris v. Hawaiian Airlines, Inc.*, 74 Haw. 235, 239–240, 842 P.2d 634, 637 (1992), *aff'd,* — U.S. —, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (quotation marks and citations omitted).

## IV. *DISCUSSION*

### A. *Hawai'i Rule of Appellate Procedure 28(b)(4)*

As a preliminary matter, we note that O'Connor's points on appeal are not points; they are arguments. Points must "refer to the alleged error committed by the court[.]" Rule 28(b)(4), Hawai'i Rules of Appellate Procedure (HRAP). O'Connor's points, however, do not refer to any error committed by the circuit court.[4]

In this civil case, O'Connor's failure to comply with HRAP 28(b)(4) is alone sufficient to affirm the judgment of the circuit court. *See* HRAP 28(b)(4) ("points not presented in accordance with [HRAP 28(b)(4)] will be disregarded"); *City & County of Honolulu v. Kailua Auto Wreckers, Inc.*, 66

---

**3.** Judgment was not entered upon the dismissal order, as required by HRCP Rule 58. However, the order resolved the claims in the case and was entered before our decision in *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 869 P.2d 1334 (1994). The order is therefore deemed a final and appealable order. *See Jenkins,* 76 Hawai'i at 119, 869 P.2d at 1338 (acknowledging prior cases and holding that for purposes of pre-*Jenkins* appeals, the time for

taking an appeal is measured from entry of the order resolving the last issue in the case and asserting that the separate judgment rule would be enforced after March 31, 1994).

**4.** O'Connor's statement of questions presented, however, asks "[w]hether the lower court committed reversible error when it dismissed the Complaint with prejudice...."

Haw. 532, 533, 668 P.2d 34, 35 (1983) (argument regarding award of costs and attorneys' fees not considered where no point of error was specified on the claim as required by predecessor Rule 3(b)(5)); *Bloudell v. Wailuku Sugar Co.*, 4 Haw.App. 498, 503, 669 P.2d 163, 168 (1983) (to properly raise issue under predecessor Rule 3(b)(5), appellants were required to cite court orders as points of error). However, the policies of this court are to permit litigants to appeal and to have their cases heard on the merits, where possible. *See, e.g., Montalvo v. Chang*, 64 Haw. 345, 641 P.2d 1321 (1982); *Jordan v. Hamada*, 62 Haw. 444, 451–2, 616 P.2d 1368, 1373 (1980); *Jones v. Dieker*, 39 Haw. 208, 209 (1952). Thus, we elect, pursuant to HRAP 2,[5] to address the issue posed by this appeal.

## B. *The Ecclesiastical Abstention Doctrine*

■ The first amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const. amend. I. The free exercise clause of the first amendment is applicable to the states through the fourteenth amendment to the United States Constitution. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Article I, section 4 of the Hawai'i Constitution (1978) provides, in relevant part, that "[n]o law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."

We are obliged to afford parties the minimum protection required by the fourteenth amendment to the United States Constitution. Because this court has not been previously called upon to determine the extent to which Hawai'i's free exercise clause may be asserted as a defense to a civil lawsuit, we look to the opinions of the United States Supreme Court and other courts that have considered similar matters for guidance.

In *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), the United States Supreme Court held that the Supreme Court of Illinois contravened the first and fourteenth amendments to the United States Constitution when it "inquir[ed] . . . into matters of ecclesiastical cognizance and polity"[6] to resolve a church property dispute. There, Bishop Milivojevich was removed as Bishop of the American–Canadian Diocese of the Serbian Orthodox Church and defrocked. The Supreme Court of Illinois reviewed the church process by which Milivojevich was removed and "held that the proceedings of the Mother Church respecting Dionisije [Milivojevich] were procedurally and substantively defective under the internal regulations of the Mother Church and were therefore arbitrary and invalid." *Id.* at 698, 96 S.Ct. at 2375. Citing his own concurring opinion in *Maryland & Virginia Churches v. Sharpsburg Church*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970), Justice Brennan wrote for the Court:

> where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity,[7] but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.

*Milivojevich*, 426 U.S. at 709, 96 S.Ct. at 2380. Citing *Presbyterian Church v. Hull Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), the Supreme Court said

---

5. HRAP 2 provides that "[i]n the interest of expediting decision, or for other good cause shown, the Supreme Court of Hawai'i may suspend the requirements or provisions of any of these rules in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction."

6. "Polity" means "a particular form or system of government." *The Random House College Dictionary* 1027 (Rev. ed. 1979).

7. The fact that the Catholic Church (in our case) is "hierarchical" is a fact that can be judicially noticed under Hawai'i Rules of Evidence (HRE) 201(b), which provides:

    A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination. HRS Chapter 626 (1985), HRE 201(b).

that the first amendment "commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. This principle applies with equal force to church disputes over church polity and church administration." *Milivojevich*, 426 U.S. at 710, 96 S.Ct. at 2381 (citation omitted). The Supreme Court explained:

The principles limiting the role of civil courts in the resolution of religious controversies that incidentally affect civil rights were initially fashioned in *Watson v. Jones*, 13 Wall. 679 [20 L.Ed. 666] (1872), a diversity case decided before the First Amendment had been rendered applicable to the States through the Fourteenth Amendment. With respect to hierarchical churches, *Watson* held:

"[T]he rule of action which should govern the civil courts ... is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.* at 727.

In language having "a clear constitutional ring," [8] *Presbyterian Church v. Hull Church*, [393 U.S. 440] at 446 [89 S.Ct. 601, 604–05], *Watson* reasoned:

"The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would

lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. *It is the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.*"

*Milivojevich*, 426 U.S. at 710–711, 96 S.Ct. at 2381 (emphasis in original).

In *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the Supreme Court held that "neutral principles of law ... [or] any one of various approaches for settling church property disputes [could be adopted] so long as [the approach] involve[d] no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith[.]" *Id.* at 602, 99 S.Ct. at 3025.

The ecclesiastical abstention rule has been applied in tort cases as well as in property disputes. For example, the Supreme Court of Oklahoma affirmed, in part, a summary judgment in favor of church defendants in *Hadnot v. Shaw*, 826 P.2d 978 (Okla.1992). In *Hadnot*, two sister plaintiffs claimed libel, slander, intentional infliction of emotional distress, and invasion of privacy after their membership in the Church of Jesus Christ of Latter Day Saints was terminated on grounds of fornication. A letter, notifying one of the sisters, was typed by the clerk of the local congregation and signed by a lay leader. The letter was opened and read by the plaintiff's husband. The other sister was handed a notification letter signed by a lay leader. *Id.* at 980. During the *Hadnot* disciplinary process, one church leader was asked why the leaders were "going after" the sisters, and the leader responded by saying "fornication." *Id.* at 984. The sisters claimed that libel, slander, intentional infliction of emotional distress, and invasion of privacy resulted from delivery of the expulsion letters and from communication of the

---

8. In dissent, Justice Rehnquist opined that the principles in *Watson* had no constitutional dimension. *Milivojevich*, 426 U.S. at 728, 96 S.Ct. at 2389.

letters' contents to the public. *Id.* at 981. Citing *Milivojevich,* the Oklahoma Supreme Court said in part:

> Under the First Amendment, the procedural norms which govern the exercise of ecclesiastical cognizance are not subject to a secular court's scrutiny. [*Id.* at 986.]
>
>  . . . .
>
> The First Amendment will protect and shield the religious body from liability for the activities carried on pursuant to the exercise of church discipline. Within the context of ecclesiastical discipline, churches enjoy an absolute privilege from scrutiny by the secular authority. [*Id.* at 987.]
>
>  . . . .
>
> The church privilege extends ... to activities or communications which occurred after excommunication if these may be termed as mere implementation of previously pronounced ecclesiastical sanction which was ... declared when Church jurisdiction subsisted. [*Id.* at 987 (emphasis omitted).]
>
>  . . . .
>
> When the target of civil litigation is simply the church's implementation of its valid ecclesiastical judicature, the Free Exercise Clause of the First Amendment will afford a shield from interference by secular inquest. [*Id.* at 988.]

*Id.* at 986–88.[9]

In *Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994), a priest had sex with the plaintiff, a parishioner whom he was counseling. The Supreme Court of Colorado decided that the church could be held liable for breach of fiduciary duty and for negligent hiring and supervision of the priest, but it could not be held liable under the doctrine of respondeat superior.[10]

The Colorado court noted that the plaintiff's claims did "not involve disputes within the church and [were] not based solely on ecclesiastical or disciplinary matters which would call into question the trial court's power to render judgment against the defendants." *Id.* at 321.

In *St. Mark Coptic Orthodox Church v. Tanios,* 213 Ill.App.3d 700, 157 Ill.Dec. 214, 572 N.E.2d 283 (1991), the Appellate Court of Illinois affirmed a trial court judgment that deferred to the church hierarchy on the issue of who controlled church property. Citing *Milivojevich,* the court noted that

> civil courts have no authority to resolve church disputes which turn on matters of church doctrine, practice, polity or administration.... A corollary to this proscription is that where hierarchical organizations have established ... rules and regulations for internal discipline ... and have created tribunals for adjudicating disputes concerning the government and direction of subordinate bodies, civil courts are required under the first and fourteenth amendments to defer to decisions of such tribunals.... Where doctrinal controversy is not involved ... mandatory deference to religious authority is not required ... and the court may choose from a variety of approaches in resolving the dispute.

*Id.* at 713, 157 Ill.Dec. at 221–222, 572 N.E.2d at 290–291 (citations omitted).

In *Davis v. Church of Jesus Christ of Latter Day Saints,* 258 Mont. 286, 852 P.2d 640 (1993), the plaintiff, a church member, claimed negligent misrepresentation, fraud, and intentional infliction of emotional distress in the handling of her claim for injuries suffered in a fall. The plaintiff claimed the church denied her a good standing report (Temple Recommend) and church work

---

9. Much of the analysis in *Hadnot* related to the Oklahoma court's prior case of *Guinn v. Church of Christ of Collinsville,* 775 P.2d 766 (Okla. 1989). In *Guinn,* a plaintiff sought damages for invasion of privacy and intentional infliction of emotional distress after church elders, implementing church disciplinary policy, accused her of fornication, urged her to discontinue a relationship, then denounced her publicly in the church after she had withdrawn from church membership. On appeal from a judgment in plaintiff's favor, the Supreme Court of Oklahoma

reversed in part and ordered summary judgment in favor of the Elders for acts of discipline that occurred before the plaintiff withdrew from the church, but held the Elders' action after plaintiff's withdrawal were not privileged.

10. There was no evidence that the priest was acting within the scope of his employment when he had oral sex with the plaintiff. *Moses,* 863 P.2d at 330.

(Church Calling) to dissuade her from pursuing claims against the church. *Id.* at 290, 852 P.2d at 643. The Supreme Court of Montana affirmed an order in limine excluding evidence regarding the denials of Temple Recommend and Church Calling. The Montana court concluded it would be "impossible to evaluate the matter of the Temple Recommend or Church callings ... without an evaluation of the Mormon religion." *Id.* Citing *Milivojevich* as "a hands-off policy when courts are asked to review such matters," the court concluded that "evidence of threats of excommunication ... would directly involve the Court in an analysis of religious beliefs and practices" and held such evidence was not admissible. *Id.* at 299, 852 P.2d at 647–649.

*Bear v. Reformed Mennonite Church,* 462 Pa. 330, 341 A.2d 105 (1975), cited by O'Connor, is a pre-*Milivojevich* case that reversed a demurrer to a complaint in equity against a church and its bishops. In *Bear,* the defendants were alleged to have called upon members of a church congregation to shun the plaintiff. It was further alleged that such shunning had a deleterious effect on the plaintiff's marriage, family life, and business. The Pennsylvania Supreme Court believed that the shunning practice might "be an excessive interference with areas of 'paramount state concern' i.e. the maintenance of marriage and family relationships, alienation of affection, and tortious interference with a business relationship[.]'" *Id.* at 344, 341 A.2d at 107. Although the court noted that the first amendment might present a complete and valid defense, it held that the appellant had pleaded sufficient facts regarding the acts of the defendants to proceed with his action. *Id.* at 335, 341 A.2d at 108.

In this case, we must take the relevant allegations of O'Connor's complaint as true and view the evidence in the light most favorable to him. *Norris v. Hawaiian Airlines, Inc.,* 74 Haw. 235, 239–240, 842 P.2d 634, 637 (1992), *aff'd,* — U.S. —, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). In so doing, we note that the sum of the allegations and the evidence show that: (1) O'Connor was warned that he would be excommunicated from the church unless, *inter alia,* he stopped publishing *The Catholic Lay Press* or removed the adjective "Catholic" and the phrase "A Traditional Roman Catholic Family Newspaper Loyal to the Holy Father" from the mast head of that newspaper; (2) O'Connor was excommunicated; (3) Bukoski made statements about the excommunication; and (4) Bukoski's statements were reported in a newspaper called *The Wanderer.*[11]

The question presented by the appellees' motion to dismiss and this appeal is whether a Hawai'i state court could decide O'Connor's claims "without extensive inquiry ... into religious law and polity" and "without resolving underlying controversies over religious doctrine." *Milivojevich,* 426 U.S. at 709–10, 96 S.Ct. at 2381. To decide that question, we look to O'Connor's complaint[12] and hold that each claim requires resolution of controversies over church doctrine, law, or polity, matters beyond the purview of state courts.

In support of his defamation claim O'Connor alleged, in relevant part, that the appellees: (1) "used and continue to use *The Hawai'i Catholic Herald* to publish false and defamatory matter about [him]"; (2) "used said paper to falsely accuse [him] of 'criminal penal ecclesiastical' violations"; (3) "falsely accused [him] of schism"; (4) accused him and others of "[t]he grave and most serious violations of establishment of their own, independent, tax-exempt, non-profit church"; (5) accused him and others of "misrepresenting the Catholic faith through their own publication and radio program and their active involvement with the excommunicated Lefebvre schism against the warnings of the Holy See"; (6) called O'Connor and others "fanatics"; (7) said O'Connor and the others "came from a neolithic mind frame"; (8) said O'Connor was "duping the faithful [and] doing a lot of harm"; (9) said O'Connor "caused others to suffer the loss of their immortal souls"; (10) accused O'Connor of "being disloyal to Pope John Paul II"; (11) "published

11. Although the record is unclear, *The Wanderer* is alleged to be another Catholic publication.

12. As previously noted, the complaint is prolix. We have extracted from it the essential elements of each claim.

their arbitrary, wicked and fraudulently contrived excommunication of [O'Connor], and ... falsely accused [O'Connor] of causing other Roman Catholics of having lost their immortal souls;" and (12) "falsely stated that the only way they ... could save other souls and [O'Connor's] soul was by excommunicating [O'Connor]."

We assume, as we must when reviewing a motion to dismiss for lack of subject matter jurisdiction, *Norris*, 74 Haw. at 240, 842 P.2d at 637, that the appellees made and published these statements. It is apparent that, to determine the truth or falsity of the statements,[13] a state court would have to inquire into church teachings and doctrine. The comments attributed to the appellees and alleged to be defamatory are phrased in terms of religious doctrine or church governance. The question whether the statements attributed to the appellees correctly reflect the church's views can be answered only by determining doctrinal correctness or by analyzing church law; these are determinations that cannot be made by civil courts. Because the law knows no heresy and is committed to the support of no dogma or the establishment of any sect, *Milivojevich*, 426 U.S. at 710–711, 96 S.Ct. at 2381, the secular law cannot determine: (1) "criminal penal ecclesiastical" violations; (2) schism; (3) whether church law is violated by establishing a separate church; (4) whether one has misrepresented the Roman Catholic faith; (5) whether, in matters of church dogma, one is a fanatic or has a neolithic frame of mind; (6) whether one is duping the faithful; (7) whether one causes others to lose their souls; (8) whether one is disloyal to the Pope; or (9) whether one must be excommunicated to save other souls. These are all matters that are patently and obviously within the realm of religious doctrine and polity; adjudication of them is clearly beyond the purview of civil courts.

In support of his claim that the appellees monopolized the Catholic newspaper trade and committed unfair and deceptive practices, in violation of HRS chapter 480, O'Connor alleged, in relevant part that:

[he] is a consumer within the meaning of Section 480–1, H.R.S., in that he ... purchases, attempts to purchase, or is solicited to purchase goods or services from the Defendant DIOCESE corporation or is a person who commits money, property or services in a personal investment in the Defendant DIOCESE corporation.

[Appellees] ... falsely stated ... that all Roman Catholics were to shun and not socialize or deal with [O'Connor] until [he] submitted himself to the control of ... Bishop FERRARIO, and agreed to forever abandon [his] right to Freedom of the Press, Freedom of Speech, and Freedom to Worship the God of Abraham as a Roman Catholic.

... The ... conduct by [appellees] constitutes unfair and deceptive acts or practices in the conduct of trade or commerce in the publication of Catholic-oriented newspapers and the sale of advertising therein, in violation of Chapter 480–2, Hawai'i Revised Statutes[.]

In support of this claim, O'Connor submitted a copy of the previously quoted letter from Ferrario to him. The letter required O'Connor to present himself to Ferrario and to provide evidence that he had "ceased the publication, 'The 'Catholic' Lay Press' or ha[d] removed from the mast head the adjective, 'Catholic' and the phrase, 'A traditional *Roman Catholic* Family Newspaper loyal to the Holy Father[.]'"

Viewing O'Connor's allegations in the light most favorable to him, and assuming arguendo that O'Connor is a consumer within the meaning of chapter 480, it is apparent that Ferrario was exercising his authority as Bishop when he sent the letter to O'Connor and when he admonished his flock not to socialize or deal with O'Connor. Ferrario's orders obviously were issued in the context of church discipline, not "in the conduct of any trade or commerce," as required for a claim under HRS § 480–2. Further, the effect of Ferrario's acts could be felt only within the church because, outside the church, Ferrario had no authority and no

---

13. *See, e.g., Beamer v. Nishiki,* 66 Haw. 572, 578, 670 P.2d 1264, 1270 (1983) ("[t]o prove defamation, the plaintiff must establish ... a false ... statement concerning another").

ability to stop anyone from dealing with O'Connor or to stop O'Connor from publishing his newspaper. *Cf., e.g., Hadnot,* 826 P.2d at 988 ("[s]overeign only within her own domain, the church has no power over those who live outside of the spiritual community"). Whether Ferrario acted properly under church law is not a matter for civil courts to decide because such a decision involves "issues of religious doctrine and polity." *See, e.g., Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979).

■ Likewise, Ferrario's acts could not deprive O'Connor of his constitutional rights. Constitutional guarantees of rights are proscriptions against the government. *See, e.g., Dedman v. Board of Land & Natural Resources,* 69 Haw. 255, 262, 740 P.2d 28, 33 (1987) ("[t]he free exercise clauses of the state and federal constitutions are written in terms of what the government cannot do to the individual") (quoting Justice Douglas' concurrence in *Sherbert v. Verner,* 374 U.S. 398, 412, 83 S.Ct. 1790, 1798, 10 L.Ed.2d 965 (1963)), *cert. denied,* 485 U.S. 1020, 108 S.Ct. 1573, 99 L.Ed.2d 888 (1988); *Estes v. Kapiolani Women's & Children's Medical Center,* 71 Haw. 190, 192–193, 787 P.2d 216, 218–219 (1990) ("[T]he constitutional guarantee of free speech is a guarantee only against abridgment by government.... [It] erects no shield against merely private conduct, however discriminatory or wrongful[.]"); *cf. Milivojevich,* 426 U.S. at 715, 96 S.Ct. at 2383 ("[I]t is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of 'fundamental fairness' or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance." (Footnote omitted.)); *Hadnot,* 826 P.2d at 988 ("Internal ecclesiastical procedure need not meet any constitutional concept of due process." (Emphasis omitted.)).

To support his claim that Ferrario defrauded and deceived him, O'Connor asserted, *inter alia* that:

Defendant FERRARIO falsely represented ... he was a Priest after the order of King Melchizedek, when, in fact, [he] was, and is, a Sodomite after the type of the King of Sodom....

... [I]n reliance upon [Ferrario's] representations ... expressed or implied ... [O'Connor] encouraged his children and grandchildren and other parents and their children to support the Honolulu DIOCESE corporation....

... FERRARIO made [these] ... representations when he knew they were false or should have known they were false and/or when [he] did not have good grounds to believe they were true, and ... with the intent to defraud [O'Connor] as well as others who were and are not Sodomites....

... FERRARIO knew that as far as [O'Connor] and other Roman Catholics are concerned [FERRARIO] was standing in the sandals of the Good Shepherd ... and [O'Connor] would rely upon those representations.

In sum, O'Connor's fraud and deceit claim was that Ferrario misrepresented himself as a priest with beliefs conforming to church doctrine and that Ferrario did not actually hold such beliefs or otherwise conform to church doctrine. These allegations cannot be adjudicated without measurement against some doctrinal standard. Thus, like the other claims discussed above, these are matters that cannot be resolved "without resolving underlying controversies over religious doctrine ...[,] church polity and church administration," something civil courts cannot do. *Milivojevich,* 426 U.S. at 710, 96 S.Ct. at 2381.

In support of his claim that Ferrario committed clergy malpractice, O'Connor asserted in part that "FERRARIO ... had a duty to adhere to the standards of ecclesiastical care of a Christian Bishop of the Roman Catholic Church[.]" To determine the standard of care of "a Christian Bishop of the Roman Catholic Church," a civil court would be required to dive into the murky waters of doctrinal purity, church definitions of priestly duties, and church notions of proper church administration. Again, like the other claims, this claim cannot be resolved "without extensive inquiry ... into religious law and poli-

ty," *id.* at 709, 96 S.Ct. at 2380, and civil courts cannot make such inquiry. *Id.*

In support of his claim that Bukoski committed clergy malpractice, O'Connor asserted, in part that Bukoski "had and still has a duty to adhere to the standards of ecclesiastical care of a Christian clergyman and an ordained priest according to the Roman Catholic Church[.]" Again, the standard of care here is defined by church law and rules, matters into which the civil courts cannot inquire.

In support of his claim that the Diocese Corporation is liable under the doctrine of respondeat superior, O'Connor alleged that "[a]t all time[s] material Defendant Bishop FERRARIO and Defendant BUKOSKI were under the direct supervision and control and employed by Defendant DIOCESE corporation ... and engaged in this ... conduct in the course of and in the scope of their employment[.]" Presuming this allegation to be true, the claim must still fail.

The standards for evaluating the acts attributed to the individual appellees, as noted above, were standards that require analysis of church doctrine or governance, matters not subject to review by civil courts. In addition to any organizational immunity provided to the church by the first amendment or by article I, section 4 of the Hawai'i Constitution, if an employee is immune from suit, it follows that the employer is also immune and cannot be held liable. *Hulsman v. Hemmeter Development Corp.,* 65 Haw. 58, 647 P.2d 713 (1982). Because we have concluded that Ferrario and Bukoski cannot be held liable on the allegations made by O'Connor, the Diocese likewise cannot be held liable.

In support of his claim that the Diocese was negligent, O'Connor merely incorporated preceding paragraphs of the complaint and asserted that he suffered damages "as a legal result of the negligent conduct of" the Diocese. O'Connor did not allege a specific claim against the corporation that is different from the claims against the individual appellees. Thus, this claim must fail for the same reasons as the others do.

In his complaint, O'Connor named Ferrario and Bukoski as defendants both individually and in their official capacities, and he argues that Ferrario and Bukoski acted as businessmen, not as church officials. This argument is contrary to the factual allegations of his complaint and his own characterization of the case on appeal. In the complaint, he alleged in relevant part that "[a]t all times material Defendant Bishop FERRARIO and Defendant BUKOSKI were under the direct supervision and control and employed by Defendant DIOCESE ... when ... [they] committed the wrongful acts alleged herein ... and engaged in this negligent and wrongful conduct in the course and in the scope of their employment[.]"

For purposes of the motion to dismiss, the allegation must be taken as true. *Norris,* 74 Haw. at 240, 842 P.2d at 637 (1992). This allegation and others, as discussed in relation to the chapter 480 claim above, plainly show that all of the statements made by the appellees were made and reported in the context of church discipline. Although he argued that Ferrario and Bukoski acted as businessmen and not as church officials, even O'Connor summarized the complaint as follows:

> [t]he Complaint herein is that Appellant was excommunicated because he was a newspaper publisher engaged in the free enterprise business of printing the truth and selling a newspaper in competition with the Bishop (FERRARIO).

As only church officials can excommunicate someone, O'Connor's argument that Ferrario and Bukoski acted as businessmen, instead of as church officials, is contrary to his complaint. The reasons for excommunication are not subject to secular court scrutiny.

Finally, unlike the plaintiff in *Guinn v. Church of Christ of Collinsville,* 775 P.2d 766 (Okla.1989) (reversing judgment that concerned disciplinary matters while plaintiff was member of church, but finding church elders could be liable for events after plaintiff withdrew from the church), O'Connor has not withdrawn from the church. Indeed he claims he is still a Catholic.[14] It was the excommunication and the reporting of the

---

14. The Vatican overruled O'Connor's excommu-    nication.

reasons for it that forms the basis of O'Connor's complaint, which matters are plainly not "conduct of ... trade or commerce" under HRS § 480–2.

## V. *CONCLUSION*

Because each count of O'Connor's complaint can be adjudged only in accordance with standards of church doctrine, church law, or church governance, such claims cannot be adjudicated by a civil court without abridging the free exercise clauses of the state and federal constitutions. When viewing O'Connor's complaint in a light most favorable to him, we can conclude only that the acts alleged to have been committed by the appellees are shielded from civil review. Thus, O'Connor can prove no set of facts upon any of his claims that would entitle him to relief in civil court, and the circuit court did not err when it dismissed his complaint with prejudice.

Consequently, we hold, that under the first amendment to the United States Constitution and article I, section 4 of the Hawai'i Constitution, civil courts have no authority to resolve disputes that turn on matters of church doctrine, practice, polity, or administration or that cannot be decided without resolving underlying controversies over such matters. When faced with such claims, civil courts must dismiss them.

Accordingly, the judgment of the circuit court is affirmed.