**Electronically Filed
Intermediate Court of Appeals
CAAP-22-0000470
09-JUN-2023
07:53 AM
Dkt. 104 SO**

NOS. CAAP-22-0000470 AND CAAP-22-0000471
(Consolidated under CAAP-22-0000470)


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


**CAAP-22-0000470**
IN THE INTEREST OF NF and AF

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 17-00211)

and

**CAAP-22-0000471**
IN THE INTEREST OF HG

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 20-00192)


**SUMMARY DISPOSITION ORDER**
(By:  Ginoza, Chief Judge, Hiraoka and Nakasone, JJ.)

In these consolidated appeals Respondent-Appellant **Father** appeals from the: **(1)** Order Terminating Parental Rights over **NF** and **AF** (the **Twins**) entered by the Family Court of the First Circuit on August 1, 2022, in FC-S No. 17-00211 (the **First Case**), and; **(2)** Order Terminating Parental Rights over **HF**[1] entered by the family court on August 1, 2022, in FC-S

---

[1]    When the Petition for Temporary Foster Custody was filed in FC-S No. 20-00192, HF was identified as HG.  The caption was amended when the family court received the birth certificate.  HF's birth certificate does not identify a father.

No. 20-00192 (the **Second Case**).[2]  Father is the natural and legal father of the Twins,[3] and the alleged natural father of HF (collectively, **Children**).[4]  For the reasons explained below, we affirm.

Mother gave birth to Children's biological sister, EF, in 2016.  On July 29, 2016, Petitioner-Appellee Department of Human Services (**DHS**) received a report of threat of abuse and threatened neglect of EF.  DHS didn't immediately file a petition for foster custody because Mother and Father (**Parents**) agreed to participate in Intensive Home-Based Services (**IHBS**); live with paternal grandmother; attend all medical appointments for themselves and for EF; and maintain contact with an IHBS case worker.  Parents stopped participating in IHBS after two weeks and left paternal grandmother's residence with EF.  DHS then confirmed a threat of abuse to and neglect of EF and filed a petition for temporary foster custody upon location, which the family court granted on August 31, 2016.  EF died on September 1, 2016, before she could be located.  An autopsy and investigation were conducted, but the cause and manner of EF's death were undetermined.

The Twins were born in 2017.  DHS filed a petition for temporary foster custody of the Twins soon after their birth. The family court granted the petition.  The Twins' date of entry into foster care was November 28, 2017.  Father appealed.  We affirmed.  In re NF and AF, No. CAAP-18-0000948, 2019 WL 6830828 (Haw. App. Dec. 13, 2019) (SDO).  The supreme court rejected Father's application for writ of certiorari.  In re NF and AF, No. SCWC-18-0000948, 2020 WL 1675713 (Haw. Apr. 6, 2020).

---

[2]     The Honorable Andrew T. Park presided over both cases.

[3]     See In re NF and AF, No. CAAP-18-0000948, 2019 WL 6830828, at *1 (Haw. App. Dec. 13, 2019) (SDO), cert. rejected, No. SCWC-18-000948, 2020 WL 1675713 (Haw. Apr. 6, 2020).

[4]     Children's mother (**Mother**) has not appealed from the orders.

HF was born in 2020.  DHS filed a petition for temporary foster custody of HF soon after her birth.  The family court granted the petition.  HF's date of entry into foster care was January 8, 2021.

DHS then filed petitions to terminate Parents' parental rights as to all the Children.  The family court conducted a hearing on April 28, May 23, and July 18, 2022.  Mother did not appear at the hearing.  Father attended the April 28 and July 18, 2022 hearings and testified on his own behalf.  The family court entered orders terminating parental rights on August 1, 2022.  These appeals by Father followed.

Relevant to these appeals, Hawaii Revised Statutes (**HRS**) § 587A-33 "provides that the family court shall terminate a parent's parental rights if it finds [by clear and convincing evidence] that: (1) the parent is not able to provide a safe family home for the child now or within a reasonable period of time; [and] (2) the proposed permanent plan is in the best interests of the child[.]"  In re R Child., 145 Hawaiʻi 477, 483, 454 P.3d 418, 424 (2019) (statutory citations omitted).

> Generally, the family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion.  Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Id. at 482, 454 P.3d at 423 (citation omitted).

Father's opening brief does not comply with Rule 11 of the Rules Expediting Child Protective Appeals.  However, we attempt to decide cases on the merits, where possible.  O'Connor v. Diocese of Honolulu, 77 Hawaiʻi 383, 386, 885 P.2d 361, 364 (1994).  Accordingly, we address what we discern to be Father's arguments on appeal.

Father challenges a number of the family court's findings of fact, and argues that the family court erred by considering the circumstances of EF's death.  The label of a

finding of fact (**FOF**) or a conclusion of law (**COL**) does not determine the standard of review. See Crosby v. State Dep't of Budget & Fin., 76 Hawaiʻi 332, 340, 876 P.2d 1300, 1308 (1994). The question whether a determination is an FOF or a COL is a question of law. Thus, the accuracy of the label affixed by the family court is freely reviewable by a reviewing court. Kilauea Neighborhood Ass'n v. Land Use Comm'n, 7 Haw. App. 227, 229, 751 P.2d 1031, 1034 (1988) (citation omitted).

> The family court's determinations with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; thus, inasmuch as the family court's determinations in this regard are dependant upon the facts and circumstances of each case, they are reviewed on appeal under the clearly erroneous standard. Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error.
>
> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

In re JM, 150 Hawaiʻi 125, 137, 497 P.3d 140, 152 (App. 2021) (cleaned up) (quoting In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001)).

In the First Case, Father challenges the following determinations by the family court:

> 65. The facts of [EF]'s case are relevant to the DHS assessment of harm in this case because the death of a sibling due to abuse/neglect or under uncertain circumstances is a safety factor that is considered by the DHS in its assessment of whether harm or threatened harm is still present in the current safety assessment.
>
> 66. The facts and circumstances of [EF]'s death are relevant to the issues before the Court in this contested TPR trial. In deciding whether the Child[ren] are subject to harm or threatened harm by the acts or omissions of the Parents, and whether the Parents can provide a safe home for the Child[ren] even with the assistance of a service plan, the Court notes that most, if not all, of the same safety issues that were present when [EF] died were also present during the current DHS management, and that these safety issues remained unresolved.

. . . .

77. The circumstances surrounding [EF]'s death are evidence of the reasonably foreseeable substantial risk of harm to the Children posed by the Parents in this case.

a. On the day of [EF]'s death, Father contacted the Department of the Medical Examiner directly to report that he had found his daughter unresponsive early that morning in her bassinet in a van in which they had been living. The Parents did not contact emergency services or police and instead placed the baby in a car seat in a different vehicle and drove around with the body for several hours before reporting the death. [EF]'s body was received approximately 18 hours after discovery and [EF] was officially pronounced dead at 9:00 p.m. on September 1, 2016.

b. The Parents' behavior after [EF] was discovered unresponsive is evidence of threatened harm to the Children in this case: A reasonably safe and prudent parent would have immediately called 9-1-1 upon discovering their newborn child unresponsive. Neither Mother nor Father called 9-1-1 at any point after the discovery. This evidence is not limited to threatened harm; it also goes to safety of the family home and the appropriateness of the service plan.

c. After discovering that [EF] was unresponsive, Father performed CPR and massaged [EF]'s chest. Father felt that [EF]'s body "still had some heat at 2:30 a.m." but there was "no heat at 2:50 a.m." so he assumed that she was dead.

d. Mother was aware of [EF]'s condition from the time of discovery, and there is no evidence that she attempted to contact emergency responders or that she otherwise attempted to obtain immediate assistance.

e. Before presenting themselves at the medical examiner's office, the Parents drove around with [EF]'s body in the car and did "errands" which included withdrawing money from an ATM; waiting at a car repair shop for 2.5 hours until the shop opened; going to Wal-Mart to obtain phone cards; and going to Carl's Jr. for breakfast.

. . . .

86. Houselessness alone is not a safety concern, so a physical, residential address is not required. Parents could live in a tent anywhere, provided that the living situation is assessed as safe. However, [EF] died while parents were houseless, which heightens the need for the DHS to assess the safety of parents' living arrangements.

. . . .

110. Father has been given the opportunity to engage in the services recommended by the DHS in services [sic] plans dated October 2, 2017, June 25, 2018, January 24, 2019, October 15, 2019, March 24, 2020, October 12, 2020,

December 14, 2020, October 1, 2021, and March 23, 2022. All the service plans were fair, appropriate, and comprehensive, and provide the steps necessary to facilitate the return of the Children to the family home.

. . . .

125. Father is not willing and able to provide the Children with a safe family home, even with the assistance of a service plan, nor is it reasonably foreseeable that he will become willing and able to provide a safe family home, even with the assistance of a service plan in the reasonably foreseeable future.

. . . .

127. Under the circumstances presented by the instant case, the DHS has exerted reasonable and active efforts to reunify the Children with Father by identifying necessary, appropriate, and reasonable services to address Father's identified safety issues, and making the appropriate and timely referrals for these services.

128. Under the circumstances presented by the instant case, the DHS gave Father every opportunity to succeed in remedying the problems which subjected the Children to substantial risk of being harmed in the family home.

In the Second Case, Father challenges the following determinations by the family court:

47. The facts of [EF]'s case are relevant to the DHS assessment of harm in this case because the death of a sibling due to abuse/neglect or under uncertain circumstances is a safety factor that is considered by the DHS in its assessment of whether harm or threatened harm is still present in the current safety assessment.

48. The facts and circumstances of [EF]'s death are relevant to the issues before the Court in this contested TPR trial. In deciding whether the Child are [sic] subject to harm or threatened harm by the acts or omissions of the Parents, and whether the Parents can provide a safe home for the Child even with the assistance of a service plan, the Court notes that most, if not all, of the same safety issues that were present when [EF] died were also present during the current DHS case management, and that these safety issues remained unresolved.

. . . .

62. The Parents' behavior after [EF] was discovered unresponsive is evidence of threatened harm to the [Children in this case]: A reasonably safe and prudent parent would have immediately called 9-1-1 upon discovering their newborn child unresponsive. Neither Mother nor Father called 9-1-1 at any point after the discovery.

. . . .

6

114. Father is not willing and able to provide the Child with a safe family home, even with the assistance of a service plan, nor is it reasonably foreseeable that he will become willing and able to provide a safe family home, even with the assistance of a service plan in the reasonably foreseeable future.

. . . .

116. Under the circumstances presented by the instant case, the DHS has exerted reasonable and active efforts to reunify the Child with Father by identifying necessary, appropriate, and reasonable services to address Father's identified safety issues, and making the appropriate and timely referrals for these services.

117. Under the circumstances presented by the instant case, the DHS gave Father every opportunity to succeed in remedying the problems which subjected the Child to substantial risk of being harmed in the family home.

The family court's combined findings and conclusions were supported by substantial evidence in the record and reflected a correct application of the law. See HRS § 587A-7(a)(4)(D);[5] In re Doe, 95 Hawaiʻi at 191, 20 P.3d at 624 ("the family court may 'look to the past and present conditions of the home and natural parents so as to gain insights into the quality of care the child may reasonably be expected to receive in the future'") (quoting Woodruff v. Keale, 64 Haw. 85, 99, 637 P.2d 760, 769 (1981)). A number of unchallenged findings in the First Case and the Second Case also detail the circumstances surrounding EF's death.[6] The family court did not abuse its

---

[5] HRS § 587A-7 (2018) provides, in relevant part:

(a) The following factors shall be fully considered when determining whether a child's family is willing and able to provide the child with a safe family home:

. . . .

(4) Facts regarding the alleged perpetrators of harm to the child, . . . which facts shall include:

. . . .

(D) Prior involvement in services[.]

[6] See FOF nos. 49-64 in the First Case and FOF nos. 31-46 in the Second Case.

discretion by determining that the circumstances of EF's death were relevant to DHS's assessment of harm and the contested issues in the termination of Father's parental rights for Children.

Father argues that the family court erred by finding he was not able to provide a safe family home for Children. The family court's determination was supported by FOF no. 125 and unchallenged FOF nos. 89-91 and 97-106 in the First Case, and by FOF no. 114 and unchallenged FOF nos. 69-95 in the Second Case, which detail Father's lack of housing and inability to supervise the Children. The family court's determination that Father was not able to provide a safe family home for Children was not clearly erroneous.

Father argues that DHS failed to provide him with a reasonable opportunity to reunify with the Children. He fails to cite where in the record the error allegedly occurred, or how it was preserved for appeal. However, we note that FOF nos. 127-28 and unchallenged FOF nos. 88-89 in the First Case, and FOF nos. 116-17 and unchallenged FOF nos. 74-75 in the Second Case, detail the frequency of Parents' visits with Children and the number and kinds of service plans offered to Father by DHS.[7] Father does not contest FOF no. 110 in the First Case, or FOF no. 99 in the Second Case, which determined that the service plans offered by DHS were fair, appropriate, and comprehensive, and provided steps that would be necessary to return the Children to the family home.

Father argues that the family court erred by finding that his mental health history subjected the Twins to threatened harm. However, Father does not contest FOF no. 76 in the First Case and FOF no. 59 in the Second Case, which found that Children were subject to threatened harm based upon Parents' histories of mental health problems. Those unchallenged findings are binding

---

[7] Services offered to Father included psychological evaluation and mental health assessment, psychiatric treatment and recommendation, therapy, parenting classes and education, and home-based outreach services.

on appeal.  In re Doe, 99 Hawaiʻi at 538, 57 P.3d at 463.  Father also argues that the family court erred by finding that Parents' act of leaving the Twins in the hospital threatened harm to the twins.  Father cites to no such finding, and we find none. Father's argument lacks merit.

For the foregoing reasons, we affirm the "Order Terminating Parental Rights" entered by the family court on August 1, 2022, in FC-S No. 17-00211 and the "Order Terminating Parental Rights" entered by the family court on August 1, 2022, in FC-S No. 20-00192.

DATED:  Honolulu, Hawaiʻi, June 9, 2023.

On the briefs:

Herbert Y. Hamada,
for Respondent-Appellant.

Stephanie W. Batzer,
for Court Appointed
Special Advocate Program.

Gay M. Tanaka,
Julio C. Herrera,
Deputy Attorneys General,
Department of the Attorney
General,
State of Hawaiʻi,
for the Department of
Human Services.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge